Ralph A. Mauller and Marjorie N. Mauller v. Commissioner.
Mauller v. Commissioner
Docket No. 1233-65.
United States Tax Court
T.C. Memo 1966-146; 1966 Tax Ct. Memo LEXIS 139; 25 T.C.M. (CCH) 780; T.C.M. (RIA) 66146; June 24, 1966
*139 Ralph A. Mauller, pro se, Route 2, Nokesville, Va. Robert E. Garfield and Harvey I. Lapin, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in petitioners' Federal income taxes for the years 1961, 1962, and 1963 in the respective amounts of $397.41, $616.04, and $528.09. The sole question presented for our decision is whether the petitioners were in the trade or business of farming during the years in question and thus were entitled to deduct losses arising out of the operation of a farm. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein and made a part of our findings by reference. The petitioners, Ralph A. and Marjorie N. Mauller, (hereinafter sometimes referred to as the petitioners) are residents of the State of Virginia and live at Route 2, Nokesville, Virginia. They filed their joint Federal income tax returns for the years 1961, 1962, and 1963 with the district director of internal revenue at Richmond, Virginia. Petitioner Ralph A. Mauller (hereinafter sometimes referred to as petitioner) attended the University of Missouri *140 from 1947 to 1949, where he received a master's degree in mathematics. In 1949 and 1950, he studied at the University of Indiana, where he did work toward a Ph.D. in mathematics and physics. From 1950 to 1955, petitioner was employed by the United States Government. In 1955, he went to work for the Melpar Corporation, a company which is primarily concerned with research and development in the area of electronics. In his work at Melpar, petitioner acquired the position of section head. This position carried with it the responsibility for supervising some 50 to 60 people, who were concerned with the successful completion of a particular project. Petitioner's duties included the acquisition of contracts, hiring of personnel, cost projection and accounting. From Melpar, petitioner went to work for Analytic Services, Inc., a private scientific consulting firm employed by the Chief of Staff of the United States Air Force. At Analytic Services, Inc., petitioner was the head of the Tactical Branch, and was concerned with the costs and logistics of certain proposed weapons systems in the short and intermediate range air space power field, including their application to land war. From 1950, *141 petitioner taught in the extension division of the University of Virginia in Fairfax County, Virginia, which was later known as George Mason College. In 1951, there were approximately 50 to 60 students enrolled in this institution. During the next 5 years, petitioner was active in expanding the enrollment to 2,500 students. Petitioner worked with the University in addition to his other full-time job. During 1965, petitioner took a year off from his business employment and devoted himself to teaching mathematics and serving as business manager at George Mason College. Since that time, he has returned to private industry. During the years at issue, petitioner was employed at Analytic Services, Inc., where he worked 8 hours per day. He taught one mathematics class during the lunch hour and upon leaving work, he taught another class from 5 to 6 o'clock. The classes met at Bailey's Crossroads, which was across the street from petitioner's place of work. During the years in question, petitioner spent approximately 1 hour per day traveling to and from work. Petitioner also was chairman of the Nokesville Methodist Church Board during the years at issue. The board usually met for 1 hour per *142 month. His church activities also included signing in the choir and teaching Sunday school. In 1963, petitioner ran for political office in the Nokesville, Virginia area. During the campaign, he would start his day driving to work at approximately 7:30 in the morning and would not return home until 11 or 12 o'clock at night. During this year, the petitioner was also chairman of the Republican County Committee. He was also president of the PTA for two of the 3 years in question. In 1950, petitioner and his family lived in a residential area in Arlington, Virginia. Shortly thereafter, petitioner moved to Pine Ridge, Virginia, where he had a house on 1 acre. After the Pine Ridge area was further built up, petitioner decided to move further out into the country. On October 30, 1959, the petitioners purchased 40 acres in Prince William County, Virginia. The original cost of the property was approximately $37,000. Subsequently on June 1, 1962, they acquired an additional 47 acres. The petitioners presently reside on this property and have done so since February 1960. Prior to the purchase of this property, petitioner's wife did most of the exploratory work in connection with its acquisition. *143 She has never had any formal course in agriculture. No professional real estate broker was used by the Maullers in their search for farm property. The previous owner of this property engaged in the raising of dairy cows, hogs, chickens, the operation of an orchard, and the growing of hay by tenant farmers. Petitioner's decision to acquire a farm was based upon his desire to live out in the country, his feeling that it would be beneficial for his three children to learn how to operate a farm, and his desire to provide approximately $1,000 per year of additional income which would help to defray the cost of his children's college education. The total acreage of the property purchased by the Maullers is 87 acres of which 34 acres are tillable. Fifty acres on the property consist of woodland, 3 acres are devoted to the residence and other buildings, 22 acres devoted to growing hay, and 12 acres are used for pasturage. In addition to the residence which took up approximately 3 acres of land, the buildings on the property consist of a barn with five stalls with storage space for approximately 30 tons of hay. There is also a small tenant house used for storage of equipment, a corn shed, a *144 smoke house, a chicken house and a calf shed out in the back pasture. Every building, with the exception of the cow shed, was on the original 40 acre portion of the property. Prior to the acquisition of the Prince William County property, petitioner had spent most of his summers during his youth on farms which belonged to his father and grandmother. He also lived on a farm in Bloomington, Indiana, which he leased during his residence at the University of Indiana, and at that time had the opportunity to care for several horses. His brother has a degree in animal husbandry and has operated two cattle farms in Missouri, and petitioner has frequently consulted with him with regard to the raising of cattle. Petitioner has never taken any formal course in agriculture. In 1960, petitioner acquired the Handbook of Agronomy published by Virginia Polytechnic Institute. This book listed the yield per acre and prices of various agricultural commodities in various parts of the State of Virginia. Using this publication, petitioner projected the amount of hay the farm could produce and the gross amount of income which could be derived therefrom. The property in question also contained an orchard *145 of 65 peach and apple trees which petitioner expected would yield a gross amount of $20 per tree each year. Petitioner also estimated that the 50 acres of woodland would yield $100 per acre from sales of timber which could be cut down 10 years from the date of his purchase of the property in 1959. The average rainfall for the area in which petitioner's property is located is 40 inches per year. The rainfall for the Prince William County area during the years 1960, 1961, 1962, and 1963 was below normal for 1960 and 1961, average for 1962 and well below normal in 1963. Because of these subnormal rainfall conditions, the hay crop only amounted to one-third of petitioner's expectation. Petitioner has never made a profit on the sale of hay. In addition, the orchard yield was below normal. In view of these conditions, petitioner decided to broaden the base of his operations, and in 1961 he commenced the breeding and raising of horses for sale. Neither petitioner nor his family had any prior experience in this area, other than owning a riding horse. During the taxable years 1961, 1962, and 1963, the horses owned and boarded by the petitioner were as follows: Year
Ponies
Mares
Foals
Total
1961
0
3 [1] *146 2
5
1962
0
4 [2]
2
6
1963
1 [3]
4
2
7
The size of the operation was restricted to the stall capacity of the barn. In 1962, one of the foals had to be destroyed because of an accident. Petitioner has never sold any horses although he had shown one which subsequently sustained a leg injury whereupon it was converted to breeding purposes. One of the horses foaled on petitioner's property in 1963 from a leased mare was registered unnamed with the American Jockey Club, the only official registration for thoroughbred horses in the United States. It was sired by a stallion named Fire Again owned by a friend of petitioner with a leased mare named Pollyfox, and through this breeding petitioner intended to raise a thoroughbred colt. As drought conditions continued into 1963 and crop development was consequently further hampered, petitioner decided to raise cattle. In September 1963, petitioner purchased two Angus cows which were duly registered with the American Angus Association. Subsequent to the years in question, petitioners purchased additional cows. As of the time *147 of trial they have approximately one dozen cows plus one herd bull. Petitioner began his cattle operation instead of increasing the number of horses on his property, because he had the existing facilities for cattle, but would have had to build a bigger barn to house additional horses. The petitioner is a member of the Virginia State Farm Bureau, the Southern States Farm Cooperative, and the American Angus Association. He subscribes to several private farm publications and also receives books from the United States Department of Agriculture. He is also a member and participant in the local Soil Conservation Service and applied fertilizer to his property in accordance with its recommendations in 1961. Petitioner's family consists of his wife, a son, and two daughters. As of the time of trial, his son was 19 years of age and attended high school during the years in question. Petitioner owns and operates on his property a tractor, mower, rake baler, wagon plows, and disc. Petitioners maintained a file of service manuals for farm equipment and provided services and repairs for all of them. Petitioner has hired no outside help other than labor to repair the barn foundation. Occasionally, *148 a neighbor has helped with the mowing and raking of hay in exchange for which the Maullers have assisted him at another time. Petitioner and his family did all the necessary work on this property. This included seeding, fertilizing, mowing, and raking hay, spraying and fruit picking in the orchard, repairs to the machinery, feeding and inoculating the stock, and delivering the young foals and calves. During the winter months, petitioner's son would arise early in the morning in order to feed the animals and clean out their quarters. He would complete other chores after he returned from school. During the summer months, petitioner's son would work full time on the property 5 to 7 days a week, since certain hay-gathering operations had to be quickly performed during favorable weather. Petitioner and his family also trained the horses which they owned. Petitioner's wife and daughters also performed various chores on the property. Petitioner himself would participate in all aspects of the operations on the property. The property was a working farm and was in no way a "show place." Petitioner's wife was solely responsible for keeping business records for the operation of the property. The *149 petitioner received and reported income from wages as shown below: 1961
1962
1963
Analytic Services, Inc.
$13,650.00
$15,937.90
$16,815.00
Melpar Corporation
1,426.88
None
None
University of Virginia
2,360.00
3,560.00
3,730.00
Petitioners reported interest income in 1963 in the amount $23of. In addition, petitioners reported income and expenses from the operation of the property for the taxable years 1961, 1962, and 1963 on their income tax returns as follows: 1961
Income from: Boarding Horse
$ 180.00
Sale of Hay
125.00
Patronage Rebates
10.00
Total 1961 Income
$ 315.00
Expenses
( 2,331.25)
Net Loss
($2,006.25) [1]
1962
Income from: Boarding Horse
$ 150.00
Patronage Rebates
13.83
Total 1962 Income
$ 163.83
Expenses
($2,754.74)
Net Loss
($2,590.91)
1963
Income from: Boarding Horse
$ 150.00
Patronage Rebates
15.00
Total 1963 Income
$ 165.00
Expenses
($2,805.21)
Net Loss
($2,640.21)
The expenses including depreciation for the farm operation as claimed in the income tax returns for the years before us are as follows: 1961
1962
1963
Labor hired
$ 10.00
$ 54.00
$ 16.00
Repairs, mainte-
nance
349.41
139.00
Feed
287.08
240.97
147.65
Seed, plants
57.80
142.30
80.00
Fertilizers
60.85
40.00
Veterinary, medi-
cine
70.25
114.75
7.00
Fuel
60.00
75.00
30.00
Taxes
100.00
100.00
26.60
Supplies purchased
43.25
Insurance
90.00
90.00
131.66
Interest
327.82
350.16
854.05
Breeding fees
100.00
Utilities
10.00
10.00
15.00
Shoeing
26.00
54.00
Farm Bureau Dues
15.00
Total Cash Ex-
penses
$1,053.95
$1,641.44
$1,630.21
Depreciation
$1,277.30
$1,113.30
$1,175.00
Total Expenses
$2,331.25
$2,754.74
$2,805.21
*150 On their 1964 income tax return, petitioners reported a total income from the property of $631 [1] and total expenses of $2,562.50 for a net loss of $1,931.50. Petitioner's income from wages as a mathematician for that year were in the amount of $18,891.80. Petitioner estimates that the income from the farm in 1965 was approximately equal to the deductible expenses. In the statutory notice of deficiency, respondent disallowed for the years in question those expenses deducted which were determined as not having been incurred in a trade or business or in a transaction entered into for profit. Respondent allowed those deductions claimed in the farm schedule for interest and taxes as non-business deductions. Opinion KERN, Judge: The question presented for our decision is whether petitioners were engaged in the trade or business of farming during the taxable years 1961, 1962, and 1963, to be able to deduct expenses and losses therefrom under sections 162(a) and 165(a) and (c)(1) of the 1954 Code. [2] *152 Respondent argues that petitioners were not motivated by the prospect of realizing a profit from *151 their farm, but rather entered into "farm-type operations" for their own personal pleasure. Petitioners contend to the contrary urging that they engaged in farming for several reasons, one of which (and an important one) was to derive a profit therefrom. Respondent calls our attention to the facts that neither petitioner had any formal agricultural training, that petitioner Ralph A. Mauller is an exceedingly active individual whose schedule left very little time to attend to the farm, that losses were reported during all 3 years before us. He asserts that these facts conclusively demonstrate that petitioners commenced farming operations only because of their love of the outdoors and their desire to have their children grow up on a farm. Whether petitioners were engaged in a trade or business in the hopes of making a profit is a question of fact which turns upon their intent. The question is whether they in good faith carried on the enterprise in order to realize a profit. See , affirming a Memorandum Opinion of this Court; , affirming a Memorandum Opinion of this Court. The realization of this profit need not be immediate, although the prospects of eventual profit have a strong bearing on the taxpayer's maintenance *153 of the requisite good faith intent to make a profit. , affirming a Memorandum Opinion of this Court. We believe, upon the record as presented to us, that petitioner did have the intent to derive a profit from the farm and find that the farm was operated for the purpose of making a profit. When the hay and fruit crops proved unprofitable, petitioners broadened the base of their operation to include horses and beef cattle. Although they reported losses for the three consecutive years before us and for the year 1964, the loss for the latter year was substantially less than for 1962 and 1963. We find the facts in this case to be markedly different from those which we recently considered in . Petitioner Ralph A. Mauller's annual income consisting of wages ranging from about $17,000 to $20,000 from his professional activities as a mathematician was relatively modest, considering that he was charged with the support of a family of five. He had no other source of income of any consequence. Petitioners were not wealthy people with amplefunds at their disposal to engage in a so-called hobby. The record is replete *154 with instances of the arduous tasks petitioners and their children performed on the farm in order to minimize the expenses of the operation. Although neither petitioner had any formal training in agriculture, they approached the enterprise with seriousness of purpose and invested much of their time and money in the hopes of making a profit. The fact that petitioner Ralph A. Mauller was engaged in other pursuits does not detract from his intent to make a profit. We are convinced that he devoted much of his time to the farm and marshalled the physical resources of every member of his family to attend to the various tasks of farming. Moreover, the fact that petitioners moved onto the farm to provide themselves and their children with what they regarded to be valuable and pleasurable farm experience does not negate their equally strong profit motive. See . We have also given considerable attention to the series of losses sustained by petitioners in their farming operations. This is an important factor to which we have given due weight. However, we conclude that on the facts as presented, the losses themselves should not control the disposition of the issue, *155 such as to transform what would otherwise be a business into a personal hobby. , affirming a Memorandum Opinion of this Court; ; . In the light of all the facts and circumstances of this case and the entire record herein, we conclude that petitioners were in the trade or business of farming and that the losses and expenses in question are therefore deductible. Decision will be entered for the petitioners. Footnotes
1. Petitioner purchased one mare in this year and boarded one, whereby the owner was to receive the foal. 2. Purchased another mare in this year. ↩
3. The pony was purchased for resale.↩
1. The correct result of such figures would yield a net loss in the amount of $2,016.25.↩
1. $631The included $500 from cattle sales, $6 of patronage rebates, and $125 for boarding a horse.↩
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *
SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deductions under subsection (a) shall be limited to - (1) losses incurred in a trade or business;↩