**Margit Sigray BESSENYEY, Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 368, Docket 30659.**

United States Court of Appeals
Second Circuit.

Argued April 6, 1967.

Decided June 1, 1967.

Orrin G. Judd, New York City (Goldstein, Judd & Gurfein, New York City, Saul D. Kronovet, Earle K. Moore and Ronald Dreier, New York City, of counsel), for petitioner.

Stuart A. Smith, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, Washington, D. C.), for respondent.

Before WATERMAN, FRIENDLY and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

Mrs. Margit Sigray Bessenyey seeks review of a decision of the Tax Court, 45 T.C. 261 (1965), insofar as it denied the deduction of losses [1] incurred in the tax years 1955–59 in the breeding and raising of horses.[2] The facts are quite fully stated in Judge Raum's opinion and a summary will suffice to expose the issue.

Mrs. Bessenyey, a woman in her fifties, resides in New York City. She is the daughter of a Hungarian count and his American wife and the granddaughter of Marcus Daly, the "copper king" of Montana. She was born and raised on her father's large Hungarian estate, a family farm devoted to forestry production and crop and livestock cultivation. The latter included horse breeding and training—heavy horses for agricultural work, and riding and carriage horses, known as Hungarians or Hungarian Half-Breds, primarily for use on the estate but also occasionally for sale. Under her father's guidance she obtained substantial knowledge of this subject and from about 1930 to 1946 had principal responsibility for the breeding and training of the Hungarian Half-Breds. After the end of World War II the family emigrated to the United States.

Some time thereafter Mrs. Bessenyey learned that the Army had brought some Hungarian Half-Breds back to this country and placed them in the Remount Service of the Cavalry and, later, in 1948, that the horses were to be sold. Thinking it would be a pity if these good blood lines were "to get scattered amongst people who did not know what they were" and hoping "in the future to be able to breed them and continue," she decided to buy some. Since illness prevented her attending the sale, she commissioned a Hungarian veterinarian who had formerly worked for the Hungarian Department of Agriculture in connection with the state farms which raised these horses to purchase mares with "the best blood lines" for her; he bought nine brood mares for about $150 each.. She first had the horses sent to a ranch in Montana which had been owned by Marcus Daly, and had passed to his descendants. Then, hearing that the horses were not receiving proper care, Mrs. Bessenyey journeyed to Montana, placed them at an adjacent family property known as the Montana Farm, and returned to New York because of her illness and that of her parents.

No breeding was done until 1954 when Mrs. Bessenyey leased a Hungarian stallion, Hompolgar IV, also known as Humphrey, who had been brought from Europe by the Army and later sold. As the result of his service, both immediate and mediate, the initial herd increased to 31 by 1959. Prior to 1955 Mrs. Bessenyey had purchased a 510 acre farm in Charles County, Maryland, because of uncertainty whether her relations with the other Daly heirs would permit continued maintenance of the

---

1. The relevant provisions are I.R.C. §§ 162, 165 and 212.

2. The deductions were:

| | |
|---|---|
| 1955 | $ 6028 |
| 1956 | 9142 |
| 1957 | 18162 |
| 1958 | 35393 |
| 1959 | 56231 |

In later returns the taxpayer claimed similar deductions as follows:

| | |
|---|---|
| 1960 | $64133 |
| 1961 | 75550 |
| 1962 | 63708 |

horses at the Montana Farm. Although she acquired the full interest in both the Montana Farm and the adjacent ranch in 1962, she has kept the Maryland Farm and used it for the boarding and training of some of the horses especially during months when the cold Montana winter impedes training there. Since 1955 she has spent between five and six months of each year at the Montana Farm, living in what had formerly been the chauffeur's cottage and devoting most of her time to the horses; during the rest of the year she has spent considerable time visiting her trainers, comparing notes with other horse breeders, viewing competitions and shows, and attending horse management courses.

Total expenses of the Montana Farm rose from $2546 in 1955 to $46,037 in 1959, and of the Maryland Farm from $3482 to $10,195. Combined income during the tax years here in question ranged from a low of $683 in 1958 for tobacco sales from the Maryland Farm to a high of $4034 the following year for tobacco and hay sales from the Maryland Farm and Agricultural Program Payments to the Montana Farm. Mrs. Bessenyey has sold only one Hungarian, a seven year old gelding for $3000 in 1964. Successful sales depend in some measure on the establishment of a registry for Hungarians in the United States. Before doing this it would be preferable to await the existence of 100 brood mares, whereas in 1964 Mrs. Bessenyey had only 28 mares and fillies and the only other breeder, a Mrs. Gyurky, had 12.

As this recital of her expenses and losses makes evident, Mrs. Bessenyey is a woman of independent means. For example, in 1956 she received $129,587 in dividends and $18,743 in tax exempt income; the corresponding figures for 1959 were $139,504 and $10,417. In 1962 she made sales of securities, evidently in anticipation of that year's stock market drop which produced capital gains of $1,844,102, and contributed securities with a fair market value of $2,959,401 to a wholly owned corporation that had become sole owner of the Montana ranch.

Mrs. Bessenyey testified that the expectation of selling the horses at a good price was on her mind before 1955, when she began to devote full attention to their breeding and training. She later discovered that until the breed had acquired public acceptance, she would have to sell the horses as trained animals. Thus she began to incur heavy expenses for training and exhibiting her geldings. In a protest filed in September, 1961, she estimated that sales would first produce a profit in 1970, that by 1975 she would have an annual income of $25,000, and that by that time her herd would be worth at least $254,000—slightly less than the expenses incurred for the four years, 1959–62. This projection, though, was based on the assumption that by 1970 training needs would be diminished so that annual expenses could be reduced from the 1959–62 average of about $65,000 to $36,420, an assumption which the Tax Court regarded with a "dim view" and did not deem to be sincerely entertained.

Judge Raum began his discussion by stating that "Under any of the possibly pertinent provisions of the 1954 Code, it is necessary that the operation be conducted for the purpose of making a profit" if a deduction was to be allowed. While such a purpose may exist even in the face of a history of unrelieved losses, such losses and the likelihood of achieving a profitable operation have an important "bearing on the taxpayer's true intention." He found that "although petitioner's horse enterprise has some of the trappings of a business, * * * she did not in fact have a bona fide intention to conduct her activities for a profit" and that her rewards from her work with the horses and the expenditures upon them "consisted of personal satisfaction in the activity." He based this conclusion in part on "the impression from observation of her during her testimony that figures and financial mat-

ters even bored her," an attitude which led him to believe "that she gave little or no thought to whether her horse enterprise would ever be profitable, or whether the large losses that were being sustained annually would ever be recouped."

The exceedingly able argument of taxpayer's counsel challenged the Tax Court's conclusion on many fronts. He stressed such undisputed facts as Mrs. Bessenyey's expert qualifications in the breeding and training of Hungarian horses, the time and effort devoted to the task, the practical and nonrecreational character of her farms, the keeping of detailed accounts, the rapid development of the light horse industry in America, and the Spartan conditions of her life in Montana. He cited her testimony that although she knew it would be expensive to build up the herd, she expected to end with a new and different luxury item for which rich people would pay well, and that she would not continue the operation if she would never make a profit but "that is not going to occur because I have a good product"— a view confirmed by an expert witness. He discounted the conclusions the judge drew from observations of Mrs. Bessenyey as having stemmed from a belief, erroneous although not unnatural in one whose daily concern is with figures, that a taxpayer who relies on books and accountants for detailed information thereby displays a lack of profit motive. He pointed to the large amount of the losses in relation to Mrs. Bessenyey's investment income, e. g., $56,231 of losses for 1959 as compared with $139,504 in dividends and $10,417 in tax exempt income—rather a high proportion for a hobby, even though the same year produced capital gains of $73,531. He further argued that the large losses taken as deductions are attributable in part to the liberality of the Internal Revenue Service in ruling that "A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming," Reg. § 1.162–12, such expenses including many amounts, e. g., feed and training costs, that might be considered to be capital expenditures under ordinary accounting principles. In summary he asked us to rule that the finding as to Mrs. Bessenyey's lack of profit motive is clearly erroneous within the formulation of United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948), and urges that reversal is necessary in the interest of achieving consistency and avoiding results "as variable as the Chancellor's foot," citing Selden, Table Talk, c. 38, p. 44 (1689).

■ If the matter were *res nova*, question could well be raised whether Congress intended that when certain productive activity is generally regarded as a business for which taxpayers can deduct expenses or losses, a particular taxpayer engaged in precisely the same physical acts should be refused a deduction because of lack of the profit motivation the others had.[3] Certainly the lack of profit motivation does not affect how the activity will contribute to the overall economic welfare. On the other hand, under high tax rates such a test would put the government in the presumably undesired position of subsidizing activities in which wealthy persons engage primarily for pleasure, see Reg. § 1.212–1(c) denying deductions for transactions "carried on primarily as a sport, hobby, or recreation * * " and Surrey & Warren, Federal Income Taxation, Cases and Materials 344–45 (1960 ed.). However, we are not writing on a clean slate. Although "horse breeding and racing, though the sport of kings, have been held in a surprising number of cases to be the business of taxpayers," Bittker, Federal Income, Es-

3. As counsel for the taxpayer has argued, extravagance in operations could be handled by disallowing excessive expenses.

Although this approach would involve administrative difficulties, they might not exceed those of the profit motive test.

tate and Gift Taxation 207 (3d ed. 1964) —and even of rich ones, see, e. g., C. I. R. v. Widener, 33 F.2d 833 (3 Cir. 1929), affirming a 9–6 decision of the Board of Tax Appeals, 8 B.T.A. 651 (1927); and Whitney v. C. I. R., 73 F.2d 589, 591–592 (3 Cir. 1934), and Farish v. C. I. R., 103 F.2d 63 (5 Cir. 1939), reversing the Board—the courts found a profit motive in all these cases.[4] The established rule, approved by this circuit and others, is that deductibility of "business-like" expenses or losses is denied unless the taxpayer can show an intention to seek profit. Morton v. C. I. R., 174 F.2d 302, 304 (2 Cir.), cert. denied, 338 U.S. 828, 70 S.Ct. 77, 94 L. Ed. 503 (1949); Ewing v. C. I. R., 213 F.2d 438, 439–340 (2 Cir. 1954); Lamont v. C. I. R., 339 F.2d 377, 380 (2 Cir. 1964); Schley v. C. I. R., 375 F.2d 747 (2 Cir. 1967); Szmak v. C. I. R., 376 F.2d 154 (2 Cir. 1967); Deering v. Blair, 57 App.D.C. 367, 23 F.2d 975, 976 (1928); Coffey v. C. I. R., 141 F.2d 204, 205 (5 Cir. 1944); White v. C. I. R., 227 F.2d 779, 780 (6 Cir. 1955), cert. denied, 351 U.S. 939, 76 S.Ct. 836, 100 L.Ed. 1466 (1956); Wise v. C. I. R., 260 F.2d 354 (6 Cir. 1958); Hirsch v. C. I. R., 315 F.2d 731, 736–737 (9 Cir. 1963).[5] Compare Reg. § 1.212–1(c). Insofar as Doggett v. Burnet, 62 App. D.C. 103, 65 F.2d 191, 193–94 (1933), or Cecil v. C. I. R., 100 F.2d 896, 901 (4 Cir. 1939), may contain contrary intimations, they run counter to the trend. Indeed, counsel for Mrs. Bessenyey does

not urge us to reject the profit motive test but rather asks us to hold the Tax Court to have been in clear error in finding that she failed to meet it.

■ If our objective were to stay as close as possible to a curve plotted through the irreconcilable body of cases in this general area, we would reverse. Speaking about deductions for losses on country estates and racing stables, Randolph Paul noted long ago that "The American businessman has never appeared so indefatigably optimistic as in some of the cases on this point; taxpayers have earnestly contended (sometimes successfully) that they expected to reap an ultimate profit even though operating losses exceeded receipts with depressing regularity over a long period of years." Motive and Intent in Federal Tax Law, in Selected Studies in Federal Taxation 281–82 (2d Series, 1938). The degree of taxpayers' success is attested by the many decisions cited in 5 Mertens, Law of Federal Income Taxation, § 28.74 notes 42–49 (1963 rev.), which also notes the occasional failures. Again, if the case were to be decided by a nose-count of the recognized "Factors Indicating Operation as Business or Transaction Entered Into for Profit," see 5 Mertens, supra, § 28.73, we think the taxpayer would win. But we have been instructed that these are not the proper criteria for an appellate court when a tax case turns on an issue of intent. C. I. R. v. Duberstein, 363 U.S.

---

4. See also John S. Ellsworth, 21 T.C.M. 145 (1962), where a wealthy taxpayer whose prime source of income was dividends and interest was held to have been engaged in business in conducting "Folly Farm" despite 13 years of uninterrupted losses aggregating almost $700,000, his own acknowledgment of the fact that when he entered the "business" at age 65, he realized that he would not make a profit before attaining 75 or 80, and evidence that his interest in breeding was scientific.

5. As said in the last cited case, "The spending of time, money and effort as a corporate executive or in any activity or venture in the general realm of business,

however, does not per se put a taxpayer in 'business' within Section 23 [1939 Internal Revenue Code]. From the early case of Wilson v. Eisner, 282 F. 38 (2d Cir., 1922) through Brooks v. C. I. R., 274 F.2d 96 (9th Cir., 1959) and Wright v. Hartsell, 305 F.2d 221 (9th Cir., 1962), the warp and woof of the definitions of 'carrying on any trade or business' as used in Section 23 and elsewhere in the Act, is that the activity or enterprise claimed to constitute 'carrying on a business' be entered into, in good faith, with the dominant hope and intent of realizing a profit, i.e., taxable income, therefrom." Hirsch v. C. I. R., supra, 315 F.2d at 736.

278, 289–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). The Supreme Court's decision rested on the belief that where a court must apply a statutory tax standard of a "nontechnical nature," decision necessarily turns on "the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, and their various combinations, creating the necessity of ascribing the proper force to each," 363 U.S. at 289, 80 S.Ct. at 1199; determination "must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case", 363 U.S. at 289, 80 S.Ct. at 1198; and appellate efforts to set guidelines within the broad standard would elevate mere "maxims of experience" into rules of law. 363 U.S. at 287, 80 S.Ct. 1190.[6] Thus "appellate review of determinations in this field must be quite restricted", and the findings of a trial judge, including "factual inferences from undisputed basic facts * * * as will on many occasions be presented in this area", are not to be upset unless "clearly erroneous," C. I. R. v. Duberstein, supra, 363 U.S. at 290–291, 80 S.Ct. at 1199, citing F.R.Civ.P. 52(a), made applicable to the Tax Court by I.R.C. § 7482(a).

■■ We cannot conscientiously say Judge Raum's conclusion that Mrs. Bessenyey "did not in fact have a *bona fide* intention to conduct her activities for a profit" leaves us with a "definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L. Ed. 746 (1948). A composite of such facts as her professed interest in the breed's fate, her mounting expenses, the long period before any expected initial profit, the meagerness of this profit in relation to the sums expended, her somewhat casual attitude on the subject, and her economic independence permit a reasonable conclusion, which the judge's observation fortified, that she started her activity primarily to preserve the breed with which she had worked as a young noblewoman and continued without much caring whether she made a profit or not although naturally hoping that she might. It is immaterial that the record would also have supported a contrary view. While we do have "a definite and firm conviction" that the judge here did not make good on the Court's prophecy of "a natural tendency of professional triers of fact to follow one another's determinations, even as to factual matters", 363 U.S. at 290, 80 S.Ct. at 1199, as we read *Duberstein* such a failure is not enough for reversal. If the judge thought, as he might well have, that other courts had been overly credulous regarding the profit motivation of wealthy taxpayers who have viewed long years of equine losses with an equanimity not manifested in true business ventures, he was free to follow his bent. The mandate of *Duberstein,* to an appellate court is to give "primary weight * * * to the conclusions of the trier of fact" as against "an academic desire for tidiness, symmetry and precision," 363 U.S. at 289–290, 80 S.Ct. at 1199, even though this may have the unfortunate consequence of lessening the predictability peculiarly essential in tax matters.

Judgment affirmed.

WATERMAN, Circuit Judge (concurring):

I concur with my brothers in affirming the Tax Court. If I had been the trier of fact I might have been inclined to have reached a different result than was reached below, but as I must appraise the facts the Tax Court found by adherence to 26 U.S.C. § 7482(a) and to the rules announced in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948), and Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278,

---

6. As the *Lamont* and *Schley* courts held, these considerations apply to the determination of a taxpayer's desire for profit as strongly as to the determination of a transferor's intent—the issue in *Duberstein.*

289–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), this inclination is insufficient to justify another dissent by me from a majority opinion of a panel of my brothers. See Schley v. Commissioner of Internal Revenue, 2 Cir. Mar. 17, 1967.

I must point out, however, that I am disturbed by the slant the Tax Court has adopted when it determines whether a very wealthy taxpayer's activity in the production of economic goods has been motivated by a "profit motive." See Schley v. Commissioner, supra (dissenting opinion). It would seem that it has become the Tax Court's practice to emphasize by an emphasis which I believe to be out of proportion to a "close relationship to the data of personal human experience and the multiplicity of relevant factual elements" [1] the factors of a taxpayer's great wealth and income, his love of his work, and the losses he incurs in prosecuting that work. And as to the losses, even though they, as in *Schley,* may have been occasioned by a forward-looking somewhat expensive temporary program adopted in the relevant taxable years so as to make future farming operations profitable, or, as here, may have been occasioned by Bessenyey's firm belief that her horse enterprise would assuredly make profits for her in the future, the fact that the taxpayer is wealthy enough to absorb the losses appears automatically to result in having findings found below such as those here: "Her rewards consisted of personal satisfaction in the activity." It would seem that, as to a wealthy taxpayer, inasmuch as losses taxpayer incurs may be comfortably absorbed by him he could not have had a profit motive in engaging in the business activity that resulted in the losses.

Of course an independently wealthy person will naturally be less concerned about temporarily making ends meet in the business activity in which he is engaged than one who, as taxpayer's parallel horse-breeder here, is "in the serious business of making a living." But this no more indicates that the activity is conducted *primarily* for pleasure, see Treas.Reg. § 1.212–1(c), than does a large corporation's expenditure of huge sums for new product development and marketing indicate it. Also, nobody would deny that if one enjoys one's primary business activity financial losses suffered thereby are more happily endured than such losses would be if suffered in an activity one detests. But should one's happiness or unhappiness be conclusive on whether one is or is not in a business for profit? Moreover, it seems inequitable that a well-capitalized corporation may undertake a long-range project despite the necessity of enduring continuous early losses in the launching of the project, but an affluent individual taxpayer may not. For example, here the Tax Court apparently disregarded the testimony of taxpayer's expert to the effect that "the enterprise should show a profit in proper time" and that taxpayer was "proceeding as expeditiously as possible" in her long-range plan of developing a new breed of luxury horses. While in this case I cannot term the Tax Court's inferences fallacious or its ultimate finding "clearly erroneous," I would suggest that the court in adjudicating cases of this kind could well give more serious consideration to such factors as whether the expectation of an ultimate profit is reasonable, how the operation is conducted, to what extent the taxpayer personally participates therein, and the likelihood that the activity taxpayer is engaged in is encompassed within the normal activities that occupy the time of other wealthy taxpayers. Surely such factors are as relevant to the question of a taxpayer's intent as the single factor of enjoyment of one's work. My views may be caused by "an academic desire for tidiness, symmetry and precision," but see Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 289–290, 80 S.Ct. 1190, (1960), and the thought that in

---

1. Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 289, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218.

tax matters the Tax Court's approach to a study of the motives of the very rich would seem to be materially different from the approach to a study of the motives of the rest of us.[2]

**2.** Compare, e.g., Theodore Sabelis, 37 T.C. 1058 (1962) and Ralph A. Mauller, T.C. Memo 1966–146 (June 24, 1966) with Ellen R. Schley, T.C.Memo 1965–111, and the present case, Margit Sigray Bessenyey, 45 T.C. 261 (1965).