James S. Bishop and Karen M. Bishop v. Commissioner.
Bishop v. Commissioner
Docket No. 5031-70.
United States Tax Court
T.C. Memo 1972-167; 1972 Tax Ct. Memo LEXIS 90; 31 T.C.M. (CCH) 829; T.C.M. (RIA) 72167; August 7, 1972
*90 Petitioner, a man of relatively modest means, incurred large expenditures in a horse racing and breeding operation. He and his wife both worked 3 to 4 hours each day doing all the manual tasks, including some normally performed by trainers and veterinarians. Held: Petitioner was engaged in the trade or business of racing and breeding horses. Marvin S. Zelman, 15th Floor, Central Nat'l Bk. Bldg., Cleveland, Ohio, for the petitioners. Buckley D. Sowards, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: The Commissioner determined deficiencies in the petitioners' Federal income tax as follows: Taxable Year
Amount
1967
$2,541.70
1968
3,197.00
The issue presented for adjudication *91 is whether the expenses incurred by the petitioners in the racing and breeding of horses are deductible under the provisions of section 162(a), [1] Internal Revenue Code of 1954, as ordinary and necessary expenses incurred in carrying on a trade or business. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. The petitioners, James S. and Karen M. Bishop, are husband and wife, residing at the time of the filing of their petition herein at Hinckley, Ohio. Petitioners filed their joint Federal income tax return, using the cash method of accounting, for 1967 and 1968 with the district director of internal revenue, Cleveland, Ohio. James S. Bishop will be hereinafter referred to as petitioner. At all times pertinent to this case, petitioner was a licensed securities salesman. His gross income from wages, commissions and consulting fees for 1963 through 1970 was: 830 Year
Amount
1963
$18,142.73
1964
19,755.02
1965
27,546.53
1966
25,504.35
1967
44,925.00
1968
39,867.00
1969
29,245.00
1970
19,400.00
*92 Since early boyhood, petitioner has had an interest in ho Since early boyhood, petitioner has had an interest in horses and worked with them extensively. On June 19, 1963, petitioner purchased Rockledge Farm consisting of eight and one-half acres of land, a "century" home and an unusable barn for $19,000. He made many improvements on the farm including the sinking of a well and complete renovation of the barn adding electricity, heating, and horse stalls. At the time petitioner acquired the farm he owned one grade (non-registered) horse. Petitioner's residence comprised less than one acre of the farm, the remainder being primarily pasture. Living with the petitioner during the years in question were his wife and daughter, Holly. In June 1963, petitioner purchased "Carter's Christy," a brood mare and registered quarter horse for $1,000. Her genealogy indicated to petitioner that she had the potential to produce high quality running horses. Petitioner also purchased two registered stud horses with good lineage and prior track earnings. "Leo San Bar" was acquired in 1967 at a cost of $2,500 and "Amass" was obtained in 1968 for $250. Both were to be used in petitioner's breeding *93 operation and available for stud service to other breeders. Between 1963 and 1971 petitioner had purchased 14 horses, foaled 14 colts (of which three died), made one trade, and completed nine sales of horses from his farm. At the end of 1967, there were six horses on the farm, having had one sale and two acquisitions that year. During 1968 petitioner bought three more horses, produced two foals, and made one sale, bringing the total to 10 horses on hand. By 1971, petitioner owned 15 horses, limiting his operation to registered horses only. If a horse could not be registered or did not appear adequate for breeding or racing, it was disposed of by petitioner. Petitioner has shown his horses at halter, trained them, and raced them. His horses have not been in any official reces, [2] nor have there been any racing earnings. However petitioner hoped that these activities would enhance the reputation of his farm and horses. Pari-mutuel betting on quarter horses was not permitted in Ohio until 1969. Prior *94 to 1969 petitioner actively sought authorization from the Ohio State Racing Commission for a commercial quarter horse meet at the Ohio State Fair. Petitioner and his family have traveled extensively in Ohio and the southwest United States to quarter horse meets and fairs. He is a member of the Ohio Quarter Horse Racing Association, the Ohio Quarter Horse Association, and the American Quarter Horse Association. Petitioner advertised his farm's stud service twice in local newspapers during 1967. He also ran a full page advertisement offering the services of Leo San Bar and Amass in the December 1968 and January 1969 editions of the American Quarter Horse Journal. Petitioner has kept a single entry ledger of farm expenses and a detailed breeding record of all horses. He made strenuous efforts to lower some of the expenses of operating his farm. Specifically, he became a licensed trainer of quarter horses, hauled his own hay and grain, and learned blacksmith and veterinary techniques. Petitioner borrowed the money needed to purchase a tractor used for hauling hay and grain for his horses. From 1963 through 1970, petitioner's gross income and expenses of his farm operation were *95 as follows: Taxable Year
Gross Income
Expenses
1963
$0
$1,916.40
1964
[3] 65.00
3,297.45
1965
125.00
3,625.67
1966
0
7,279.71
1967
0
8,645.00
1968
0
9,581.00
1969
200.00
7,452.00
1970
486.00
6,880.00
Petitioner and his wife individually spent from 3 to 4 hours per day caring for the horses. There were no employees working on the farm. Petitioner, his wife, and daughter made limited personal use of some of the horses 831 on the farm. Petitioner's daughter would assist in training the horses, usually riding every other day. Ultimate Findings of Fact During the years 1967 and 1968 the petitioner was engaged in the business of racing and breeding horses with the intention of making a profit. Opinion The only issue before us is whether petitioner's horse racing and breeding operation constituted a trade or business thereby permitting the deduction of all ordinary and necessary expenses under section 162 (a). [4]
*96 It has long been held that the racing and breeding of horses may be an enterprise entered into as a business for profit. Wilson v. Eisner, 282 F. 38 (C.A. 2, 1922). There must exist the intention that the operation be conducted for the purpose of making a profit. The intention of the taxpayer is a question of fact to be determined from all of the evidence. That purpose may exist even where there has been a record of continuous losses without any gains whatsoever. Furthermore, the expectation of profit need not be reasonable, only genuine. Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967). After a comprehensive analysis of the facts presented in the instant case, we are convinced that petitioner operated his horse breeding farm as a business with the intention of making a profit. This is not the typical case of a "gentleman farmer" or of "hobby losses." Petitioner's income as a securities salesman ranged from a low of $18,142.73 in 1963 to a high of $44,925 in 1967, with considerable variation from year to year. *97 It is difficult to imagine that a person, whose relatively modest income fluctuated greatly, would make large expenditures and engage in the physical labor required to breed and show horses without having the intention to make a profit. That he may have enjoyed his work does not require an opposite conclusion. Petitioner and his wife kept accurate and detailed business records relating to the horse operations. They also endeavored to reduce farm expenses by hauling their own hay and grain, training the horses themselves, and doing without outside help when possible. Petitioner has attempted to enhance his horses' marketability through participation in horse shows and races, advertising, and elimination of those horses which did not appear to have sound breeding characteristics. Furthermore, we are impressed with petitioner's participation in efforts to gain official sanction for pari-mutuel betting on quarter horse racing in Ohio prior to 1969. A history of continued losses over a series of years or the improbability of achieving any profit is a significant factor bearing on the taxpayer's true intention. Morton v. Commissioner, 174 F. 2d 302 (C.A. 2, 1949), affg. *98 a Memorandum Opinion of this Court. Nevertheless, "the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a latter profitable level of operation." Margit Sigray Bessenyey, supra, at 274. Upon examination of the entire record we conclude that petitioner was engaged in the business of horse racing and breeding with the intention of making a profit. Decision will be entered for the petitioners. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. A horse by the name of Suzy San was entered at the Lorain County Fair at the time of the trial, which was officially sanctioned by the Ohio Quarter Horse Racing Association.↩
3. Sale of dogs.↩
4. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *.↩