LEONARD F. BARCUS and MARIE P. BARCUS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Barcus v. Commissioner
Docket No. 2751-71.
United States Tax Court
T.C. Memo 1973-138; 1973 Tax Ct. Memo LEXIS 153; 32 T.C.M. (CCH) 660; T.C.M. (RIA) 73138; June 25, 1973, Filed Leonard F. Barcus, pro se. Russell F. Kurdys, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the calendar years 1967 and 1968 in the amounts of $1,807.88 and $579.45, respectively. The only issue for decision is whether petitioners *154 in each of the years 1967 and 1968 are entitled to deduct losses which they claimed to have sustained in a business of purchasing and selling antiques. 2 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, had their legal residence in New Rochelle, New York at the time of the filing of their petition in this case. They filed joint Federal income tax returns for the calendar years 1967 and 1968 with the district director of internal revenue for the Manhattan District of New York. Petitioners were married in 1943. Approximately two years after their marriage, Marie P. Barcus (Marie) told her husband, Leonard F. Barcus (Leonard), that she would like to go into the antique business. Initially, he was opposed to her idea but after she bought and sold a few items, he agreed to assist her in undertaking to buy and sell antiques. They got literature on the purchase and sale of antiques, gave a name (Marlen House) to their operation and purchased and sold a few items. In 1955 petitioners moved from an apartment to a house and converted a two-car garage at the house into a studio. The only capital which they *155 put into their operation was money from the salary earned by Leonard which they used to buy some items for resale. Items they sold initially ranged in price from 50 cents up to $1,500. In 1958 petitioners moved to a home on Lyncroft Road, New Rochelle, New York and were residing in this home at the time of the trial of this case. Their home on Lyncroft Road in New Rochelle is in a residential section. The price range of homes in this area was between $60,000 and $100,000 as of the date of the trial of this case. 3 Leonard has a Bachelor's Degree in Physics and a Master's Degree in Astronomy from the University of Virginia. From 1957 through 1959 he was employed as a plant manager of an optical plant and from 1960 through 1963 as its sales manager. Since 1964 Leonard has been employed as an assistant to the vice president of Farrand Optical Co., Inc., in Valhalla, New York. During 1957 through 1971 Leonard's salary has ranged from a low of $24,232 in 1957 to a high of $31,200 in 1970. Leonard devoted full time to his salaried employment, and his primary connection with the sale of antiques was to assist Marie in the bookkeeping and in the purchase of the antiques.
*156 Leonard has been interested in collecting and has for many years collected various items, including antiques, as a hobby. Leonard has pursued his hobby of antique collecting at least since 1945, and during the years since Marie began to buy and sell certain antique items has made an effort to separate items he purchased intending to keep in furtherance of his hobby from items which he or Marie, or both of them together, purchased for resale. Since petitioners moved into their Lyncroft Road house in 1958, many of the antique pieces of furnishings, antique paintings, and other items which they purchased with the idea of reselling have been used as the furnishings of their home. When an item is sold by petitioners from their home, it is replaced with another item or items which are kept in a basement area of their home that they consider a studio. During the years 1967 and 1968 about 95 percent of the personal household furnishings in use in petitioners' home were 4 antiques which petitioners were willing to sell.In 1967 and 1968 petitioners had antiques on hand that they were willing to sell that had cost them between $27,000 and $34,000. Many of these items were in the basement *157 studio and many were being used by petitioners as the furnishings of their home. Although the items of furnishings which petitioners used in their home but were willing to sell were scattered throughout the first and second floors of their house, none of these items was located on the third floor which was the area where Leonard kept items he had collected which we was not willing to sell. Petitioners in either July 1969 or July 1970 looked over the items in the dining room and living room of their home and estimated that the items in each room cost them approximately $4,000 and that they would like to obtain about $15,000 from the sale of the items in the living room and about $12,000 from the sale of the items in the dining room. Shortly prior to the trial of this case in early 1973, petitioners looked over the list of items that were in their living room and dining rooms in July 1969 or 1970 and determined that a number of items that had been in their home at the earlier date had been sold, some for less and some for more than they had hoped to get. The items that had been sold had been replaced with other items that petitioners would sell at such time as they thought the price *158 was satisfactory. Around 1965 or 1966 petitioners acquired a pair of oriental horsemen for approximately $125. As of the date of the trial of this case they hoped to get between $3,000 and $5,000 for the pair of horsemen and had turned down an offer of $2,400 for the pair. 5 Petitioners did not have any sign on their premises indicating that the antique furnishings in their home were for sale and did no advertising in newspapers, magazines, or any form of publication. Petitioners in 1959 changed the name of their operation from Marlen House to Lenmar Hall. Marie became a member of the Antique Dealers Association. Petitioners opened their house to meetings or fund raising activities of the Cancer Society, City of Hope, and various other fund raising charitable organizations. At times these organizations would have from 75 to 100 persons at Marie's house and she would lecture to them on antiques without charge and take them for a tour of the house. Around 1963 the Little Telegram and Sun did an article about Marie and articles have been written about her interest in antiques in local papers. Marie had an asthmatic condition for many years prior to and during 1967 *159 and 1968. Leonard was of the opinion that working with antiques was a therapeutic activity for Marie's physical condition. Petitioners made every effort to conduct the sales of antiques from their home in such a manner as not to offend their neighbors. The average gross profit for retail antique dealers who sold from private shipments in the United States in 1967 and 1968 was 45 percent. The following schedule shows for each of the years 1957 through 1971 the purchases, sales, expenses claimed, gross profit, net profit, cost of items which petitioners had on hand for sale at the close of the year and percentage of gross profit of petitioners' sales of antiques as shown on their records: 6 Gross
Net profit
Cost
Purchases Expenses profit
items Cost of
Year
[1]
Sales claimed or (loss) or (loss)
petitioners Percentage had on hand of gross for sale
profit
at close of year
1957
$4,055 $5,228
$2,352
$873
(-$1,479)
$3,277
16.5
1958
9,769 14,056
5,354
2,447
(-709)
4,557
17.5
1959
10,290 14,074
4,597
2,792
(-2,5 63)
4,765
20
1960
18,722 17,030
6,987
(-160)
(-4,757)
6,297
loss
1961
16,812 14,047
6,856
3,238
(-3,749) 11,300
23
1962
9,194 12,007
5,950
3,441
(-3,415)
11,447
28.6
1963
11,998 12,757
5,384
3,572
(-2,378)
14,64 0
28
1964
11,961 13,171
5,070
1,243
(-3,827)
14,800
9.5
1965
16,455 16,800
4,583
3,645
(-938)
18,100
22
1966
18,280 12,098
5,021
1,418
(-3,603)
25,700
12
1967
7,450 3,723
[2] 2,505
(-2,803)
(-5,308)
27,300
loss
1968
10,962 5,011
[2] 2,130
234
(-1,896)
34,500
5
1969
14,106 11,563
1,902
2,299
+397
39,400
20
1970
10,454 6,383
1,946
2,149
+203
45,700
34
1971
3,538 1,944
1,910
906
(-1,004)
48,200
47
*160 About 1960 petitioners decided to show in their home more physically large antiques than they had previously shown and for that reason decided to dispose of some of the smaller antiques that they had on hand. At that time, they sold a number of the items they had been accumulating to dealers for less than they had paid for them. 7 During many of the years from 1957 through 1971, petitioners *161 took European trips. In the year 1966 petitioners claimed as a business expense deduction $1,580 of the cost of their European trip, and in 1967 claimed $220 or 10 percent of the total cost of their trip to Europe as a deductible business expense. During each of these years, as well as in some other years when they were in Europe, petitioners bought certain items which they brought to their home and offered for sale. On Schedule C of their 1967 and 1968 income tax returns, petitioners claimed business expense deductions in connection with the sale of antiques which included the following items: Item of expense
Amount 1967
Delivery charges
$676
60 percent of telephone
531
40 percent of house
954
2,000 miles at 15 cents per mile
300
Taxis, trains, etc.
500
10 percent of trip to Europe
220
Total
$3,181
1968
Delivery charges
$236
Artist fees, plating, etc.
779
60 percent of telephone
547
40 percent of house
983
2,000 miles at 15 cents per mile
300
Trips to New York City (75 $6at)[ sic ]
300
Total
$3,145 8 Petitioners were first contacted by telephone with respect to an audit of their 1967 and 1968 income tax returns on March 25, 1969. *162 Audits were performed in petitioners' home on Lyncroft Road in New Rochelle, New York on June 1, 1969, and September 10, 1969. On Schedule C of their Federal income tax return for the calendar year 1967 petitioners reported a loss of $5,308 from the sales of antiques and reduced their otherwise reportable income by this amount. On Schedule C of their 1968 return, petitioners reported a loss of $1,896 from the sales of antiques and reduced their otherwise reportable income by this amount. Respondent in his notice of deficiency disallowed these claimed losses with the explanation that petitioners had failed to establish that the losses were incurred in a trade or business or in a transaction carried on for profit. OPINION Section 162, I.R.C. 1954, [1] provides for the deduction of all the ordinary and necessary expenses paid or incurred during a taxable year in carrying on a trade or business. Section 165(a) provides for the allowance as a deduction of any loss sustained during the taxable year and not compensated for by insurance or otherwise. Section 165(c) provides that in the case of an individual, the deduction for losses provided for under section 165 is limited to *163 casualty losses and losses incurred in a trade or business or in a transaction entered into for profit though not connected with a trade or business. 9 Petitioners in the instant case take the position that the losses they reported on their returns in connection with the purchase and sale of antiques were losses incurred in a trade or business. Petitioners do not specifically argue that if we should decide that they were not engaged in a trade or business, they should be entitled to deduct the losses as losses incurred in a transaction entered into for profit. However, respondent takes the position not only that petitioners were not engaged in the trade or business of selling antiques, but also that the purchases and sales of antiques by petitioners were not a transaction entered into for profit. We have considered, on numerous occasions, whether losses arising from various operations which individuals have claimed to be losses incurred in a trade or business or in a transaction entered into for profit are deductible. The criterion we have used to determine the deductibility of a loss reported from an *164 activity by an individual is whether the taxpayer's purpose in undertaking the activity is to make a profit. As we pointed out in Margit Sigray Bessenyey, 45 T.C. 261, 273, 274 (1966), affirmed 379 F. 2d 252 (C.A. 2, 1967), certiorari denied 389 U.S. 931 (1967), under either section 162 or section 165, or any other possibly pertinent provision of the 1954 Code, it is necessary that an operation be conducted for the purpose of making a profit in order for any loss arising from an excess of expenses over income to be deductible. We further pointed out in that case that a purpose of making a profit may exist even though there is a history of losses with no gains whatsoever, "but the deductibility of those 10 losses must depend upon the taxpayer's proven intention that he sought to realize a profit." The expectation of profit need not be a reasonable one, but it must be a bona fide expectation. A record of continued losses over a series of years or the unlikelihood of achieving a profitable operation in the reasonably foreseeable future is an important factor bearing on the taxpayer's true intention. The intention of the taxpayer is a question *165 of fact and each case must be determined upon its own facts. We have in this case considered all the facts of record and determined from these facts that petitioners' purchases and sales of antiques did not constitute a trade or business or a transaction entered into for profit. The record shows that petitioners used the antiques they were willing to sell as the furnishings of their home. They held items over long periods of time even though they were offered a reasonable or in some instances a very large profit to sell the item. The example testified to by Leonard was the pair of oriental horsemen they purchased "6 or 7 years ago" for $125 but were still holding even though they had been offered as much as $2,400 for the pair. The schedule of petitioners' purchases, sales, and expenses shows a disproportion of purchases to sales in many years. This fact, as well as the testimony of both petitioners, points to a conclusion that petitioners were more inclined toward buying antique items which they liked and would be pleased to display in their home than in purchasing items for quick resale at a profit. The testimony by Leonard that many of the items they were holding would increase *166 in 11 value and some day they might sell them at a large profit indicates more of an interest in keeping items petitioners have purchased which they considered valuable than it does the making of a profit from a trade or business of purchasing and selling antiques. In our view the evidence as a whole indicates that petitioners enjoyed purchasing antiques, enjoyed living with beautiful antiques in their home, and engaged in the purchase and sale of these items more as a way to reduce the cost of living in a home furnished with beautiful antiques than for the purpose of making a profit on the purchase and sale of those antiques. Marie in her testimony stressed her lectures and the fact that she opened her house to charitable organizations. In her view this indicated that her antiques were for sale in a business or transaction entered into for profit. However, our inference from the record is that these activities are ones which she enjoyed and were not primarily for the purpose of making a profit. Marie stated in her testimony that "years ago an old man told me that junkmen make profits but antique dealers don't see any for years and years and years because they're always *167 upgrading their - and maybe I was a fool doing that but I've upgraded my stuff." This statement accords with our inference from the record as a whole that Marie was more interested in the quality of the antiques which would be displayed in her home than in making a profit on the sale of antiques. The record shows that from 1957 through the years here in issue petitioners never had a net profit and in some years had no gross 12 profit but rather a gross loss. The inference from the record is that petitioners had never made a profit from the purchase and sale of antiques prior to 1969. The small profit which petitioners showed from the sale of antiques in 1969 and 1970 was a result of a reduction in "expenses claimed" to an amount well below the amount of "expenses claimed" in any prior year beginning with 1957. The "expenses claimed" by petitioners include part of the cost of maintaining their house, part of the cost of the telephone in their home, and part of the cost of driving their automobile computed on a mileage basis. The small profits in 1969 and 1970 arising from a reduction in this type of expense are not persuasive that petitioners had a profit motive in the purchase *168 and sale of antiques, particularly since the small profits occurred in two years following the date on which a revenue agent had questioned the deductibility of losses claimed in prior years. The only case cited by petitioners in support of their position is Wright v. United States, an unreported case, ( D. Nev., 1965, 65-1 U.S.T.C. par. 9203), in which the Court held that a farm which had shown losses over a continued period was a business operation. Petitioners particularly point to the statement by the Court in the Wright case to the effect that a taxpayer is entitled to embark on his own business enterprises no matter how impractical and that it is not "for the Collector to criticize the particulars of the management of the business by the taxpayer." 13 Certainly, a taxpayer is entitled to embark on a business enterprise and if in fact that enterprise is a business enterprise is entitled to deduct his losses. The impracticality of the enterprise and the unlikelihood of making a profit are merely factors to be considered along with all other evidence in determining whether the intent of the taxpayer is to make a profit. In this case we conclude from the *169 evidence that petitioners' purchases and sales of antiques were primarily to keep their home furnished with antiques, to enjoy their trips abroad more by looking for antiques to purchase while traveling, and to occupy their weekends and other free time in the pleasurable undertaking of "antique hunting." By selling some of the antiques from their home, they were able to pursue their "antique hunting" and keep their home furnished with antiques at a far less cost than they would have had if they had not sold some of the antiques. In reaching our conclusion we have not overlooked petitioners' statements that they owned antiques which they expected in the years to come would greatly increase in value and then could be sold at a very large profit. In our view this speculative hope of a profit at some time in the future is not persuasive that petitioners' intent in the purchase and sale of antiques was to make a profit. On the facts in this record petitioners have failed to show that their real motive in the purchase and sale of the various antique items was making a profit. We therefore sustain respondent's disallowance of the claimed losses deducted by petitioners. Decision *170 will be entered for respondent. Footnotes
1. These purchases are obviously not the cost of sales, and it does not appear from this schedule how cost of sales was computed. ↩
2. These expenses are less in each year than the expenses claimed by petitioners on Schedule C of their income tax returns. In 1967 the amount is $676 less than the amount of expenses claimed by petitioners on their return, the exact amount claimed as "Delivery charges." In 1968 the amount is $1,015 less than the amount of expenses claimed by petitioners on their tax return which is the combined amount claimed as "Delivery charges" and "Artist fees, plating, etc." Since the net loss claimed by petitioners on their returns for 1967 and 1968 is the same as shown above, these expenses have apparently been included in cost of the items sold in their Schedule. ↩
1. All references are to the Internal Revenue Code of 1954.↩