Sidney Lemmon and Elizabeth Lemmon v. Commissioner.
Lemmon v. Commissioner
Docket No. 7054-65.
United States Tax Court
T.C. Memo 1968-102; 1968 Tax Ct. Memo LEXIS 193; 27 T.C.M. (CCH) 503; T.C.M. (RIA) 68102; May 29, 1968. Filed *193 Held: 1. Petitioners are not entitled to deduct expenses incurred in a venture to sell advertising and promotional aids. 2. Petitioners are not entitled to deduct expenses incurred on a trip made to settle an ad valorem tax liability on certain land; they were neither ordinary nor necessary, and there was no expectation of profit present. 3. Petitioners are not entitled to deduct a loss claimed on account of a bad debt because the debt was not substantiated sufficiently to meet petitioners' burden of proof. 4. Petitioners are not entitled to deduct a casualty loss for a damaged driveway because they failed to bear their burden of proof by demonstrating the loss in value to the real estate resulting from the damaged driveway. k. Petitioners are not entitled to deduct as a casualty loss the value of a watch allegedly stolen from petitioners' car because neither the event nor the amount of loss was substantiated satisfactorily to overcome their burden of proof. 6. Petitioners are not entitled to deduct medical expenses because of a failure on their part to show that such expenses were not reimbursed, and thus have not met their burden of proof. 7. Petitioners incorrectly reported income *194 purportedly received by assignment from petitioner Elizabeth Lemmon's elderly mother intended to be used primarily to support her, and are therefore entitled to a reduction in their gross income equal to the amounts incorrectly reported. 8. Petitioners are not entitled to a deduction for a personal exemption for petitioner Elizabeth Lemmon's elderly mother because she had well over $600 income per year. 504 9. Petitioners are not entitled to deduct as a charitable contribution any of the expenses incurred by their daughters in a world tour of five weeks during which they devoted a portion of five days to being messengers from their church to the Baptist World Alliance Youth Congress at Beirut, Lebanon. Claude R. Sanders, for the petitioners. Edward G. Lavery, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent assessed income tax deficiencies against petitioners for the calendar years and in the amounts of $1,043.88 for 1961, $1,446.55 for 1962, and $1,348.24 for 1963. The deficiencies all resulted from respondent's disallowance of various deductions claimed by petitioners on their joint returns for the years in question. Subsequently, however, *195 petitioners denied that certain funds received by them and reported as income should have been so returned. Thus, the issues before the Court here demand examination not only of disallowed deductions, but also of items reported as income which may have resulted in an overpayment of tax by petitioners. Findings of Fact Some of the facts have been stipulated; they are so found, adopted as our findings, and incorporated herein by this reference. Petitioners Sidney and Elizabeth Lemmon are husband and wife, and lived in Kansas City, Missouri, at the time the petition was filed. They filed their joint Federal income tax returns for the taxable years 1959 through 1963 with the district director of internal revenue at Kansas City, Missouri, and used the cash basis of accounting. Issue 1 Petitioner Sidney Lemmon has spent most of his life involved in one capacity or another with the sales, promotional and advertising businesses. For approximately 10 years, from 1936 to 1946, he was employed by the Southwestern Bell Telephone Company in sales work. Since 1946, he has been engaged to some extent in the selling of advertising and promotional aids. In November, 1946, he was employed by the Osborn *196 Company of Clifton, New Jersey, as a commissioned salesman to sell advertising and promotional aids. After about two years, petitioner accepted a similar position with the Harry J. Scott Company of Kansas City, Missouri. He held that position until 1954, when he went into business for himself. Businessmen often use advertising aids such as Sidney allegedly sold in publicizing their businesses. Pencils, notebooks, matchbooks, currency clips, key rings, balloons and many other similar give-away items bearing the printed name of a business are common methods of this sort of advertising. Sidney wrote orders on the premises of the customer, using samples and catalogues to help the customer decide which items would best suit his needs. Sidney was not very successful in his venture. The income from Sidney's venture during the years in question was as follows: Year
Items Sold
Cost of ItemsSold
Differ- ence
1961
[1] $1,166.17
$686.89
$ 489.28
1962
1,492.58
807.93
684.65
1963
1,179.45
687.36
492.09
Yet the total of his business expenses deducted in his income tax returns for those years was as follows: Year
Business ExpenseDeduction
1961
$3,963
1962
7,213
1963
9,1 11
*197 Thus, Sidney showed no profit from his sales ventures in any of the years in question. As a matter of fact, his expenses were so great during the entire life of the venture, that he failed to show any profit at any time while he was in business for himself. His claimed expenses were always great enough to result in a loss which offset other income received by him so that he never recorded any tax liability in his returns. A large part of the business expense which Sidney deducted was for "rent" allegedly paid for using a part of his home for business, for salaries allegedly paid his daughters for work performed in his home business and for his travels around the mid-western states and other parts of the country. This travel was ostensibly in an effort to sell his products. As he traveled around the country he would purportedly 505 contact prospective customers in each of the cities he visited. However, during the period in question, Sidney did not make any sales to customers outside Kansas City, his hometown. Sidney's expenditures in the interest of developing new customers seemingly went for practically naught also; during the 3-year period in question he made a grand total of 35 *198 sales to 14 customers, nine of whom were new customers in those years. Only one of the nine new prospects ever made another purchase. Also during 1963 in the three summer months when he claimed approximately $1,200 for salaries paid to his two daughters, they were on a long tour of Europe, Africa and the Mid East which lasted at least five weeks. Sidney alleges that the reason his venture has not been successful is because his own health has not been good. He apparently was afflicted with a number of lingering ailments which, if serious, could have curtailed his activity. Sidney's physical activities during the years in question were, however, not those of an ill man. Not only did he personally build shelves in his office, but he also ran water pipes through the area, doing all the work himself. During the entire period in question, he traveled extensively throughout the mid-western states by automobile, and even drove to New York from his home in Kansas City, making numerous stops en route. His testimony and the other evidence of record disclose the discordant conflict between his alleged poor health and his busy so-called profit-making junkets. The amounts he claimed for business *199 expenses and travel increased from $2,800 in 1958 to $3,900 in 1961, and then up to $9,100 in 1963. Meantime his gross sales declined from $4,000 in 1959 to $1,166 in 1961 and $1,179 in 1963. Sidney became the owner of at least sixmedical insurance policies on himself during the period in question. On the applications for four of them, all signed by him, he attested to his own good health, and denied knowledge of such "lingering ailments" as would curtail his business activities. On another application, also signed by him, he failed to mention any of the "lingering ailments" serious enough to prevent a successful business operation. Issue 2 Sidney inherited 40 acres of land in La Salle County, near Cotulla, Texas, from his father who died in 1922. The land is unimproved, and has never produced any income. On January 28, 1963, Sidney received a statement of delinquent taxes from the State of Texas, County of La Salle, for the years 1932, 1933 and 1961. On February 10, 1963, Sidney and his wife started to drive to Cotulla; they paid the taxes due on February 20, 1963, the day they arrived. The total due was $32.71. While they were in Texas, Sidney made a perfunctory and preliminary *200 investigation as to how the land might possibly be used for agricultural or petroleum production. Petitioner made two further trips during 1963 for similar purposes. He took his wife along on all three trips, and deducted the total cost on his 1963 return. The land still has neither been explored sufficiently to determine the presence of minerals or petroleum, nor been developed for agricultural use. The sole purpose of the first trip was to pay $32.71 in real property taxes. Sidney conducted his preparatory investigations while he was there, but with no advance planning or contacts. He was not successful on any of his trips in determining how the land might be put to productive use, nor was it income producing at any time during the years in question or up to time of trial. Issue 3 During the years 1958 and 1959 Sidney had T. L. Rhoades working with him in his advertising venture. Sidney paid the total cost of operating the business. Rhoades' share of the cost, according to Sidney, came to $748.98 at the end of 1959. The amount was reduced by Sidney's crediting commissions owed to Rhoades which were unpaid in the amount of $77.09, leaving a net due petitioner from Rhoades of $671.89. *201 Sidney insisted that Rhoades owed him that part of the cost, but received no satisfaction. In 1960, Sidney retained an attorney, who was also unable to collect the amount. Rhoades left the Kansas City area in 1960 or 1961, so Sidney deducted $671.89 on his return for 1961 as portion of a much larger "casualty loss" deduction claimed for that year. He now contends that he is entitled to the deduction as a bad debt loss in 1961. Issue 4 On their 1961 or 1962 return, petitioners deducted a casualty loss which included an amount due to the claimed destruction 506 of the concrete driveway of their home. [1] The destruction was allegedly caused by a truck loaded with wood which drove into the driveway in 1960 in such a manner as to crack the pavement. It is contended that the truck was overloaded and too heavy for the driveway surface. Petitioner Sidney Lemmon testified that he did not take the deduction in 1960 because subsequent freezing and thawing of the ensuing winter tended to disintegrate the driveway further and make it obvious that it had been damaged. Apparently then the event occurred in 1960, the full extent of loss was determined in 1961 and some time thereafter the loss was *202 claimed. Petitioners purchased the house in 1949, and the driveway was in good condition at that time. Although the amount of the deduction now sought, $1,375, was determined by computing the estimated cost of replacement in February of 1963, the driveway has never been repaired or replaced. In fact, it was still being used at time of trial. Sidney estimated that the later estimated cost of replacement was the same as the amount by which the fair market value of his home was reduced by the casualty, so he urges that he be allowed to deduct that amount for 1961, the year in which he realized the full *203 extent of his loss. In February of 1963 he obtained an estimate indicating that at that time the cost of removing the old concrete driveway and replacing it with a "new 4" concrete driveway and curb returns at entrance would be $1,375. The bid was based on 1,100 square feet of driveway. Issue 5 On their 1962 return, petitioner deducted $1,082 for "Casualty Losses"; allegedly included therein was an amount equal to the value of a wrist watch, which Sidney claims was stolen. In his opinion, the value of the watch at the time of the theft was between $40 and $50; he claims that it was stolen from his automobile one night when left therein on some unspecified date. Neither the date of the purported theft nor the value of the watch was established by the evidence, other than by petitioner's casual opinion that when it vanished the watch was worth between $40 and $50. No police report was introduced in evidence nor was the event otherwise substantiated. Issue 6 Respondent disallowed various medical expenses deducted by petitioners during the years in question. Petitioners incurred and paid medical expenses for the years and in the amounts of $2,140.25 for 1961, $1,731.45 for 1962, and *204 $1,218.20 for 1963. Sidney held at least six health and accident insurance policies, and possibly more, during those years. Petitioners were reimbursed by at least two of the six companies for the expenses incurred, or some portion thereof. Issue 7 Maude W. McDaniel, the mother of petitioner Elizabeth Lemmon, was in ill health throughout the years in question, and finally died in 1966 at age 91. Maude executed a trust agreement on December 31, 1959, naming Elizabeth as trustee, directing the trustee to pay the net income from the trust to the settlor for her life. Maude reserved the power to alter, amend or revoke the trust, the corpus of which consisted of stock. She also maintained certain stock in joint tenancy with Eliazbeth and owned certain other stock, title to which was in her name and the name of Kirk McDaniel, Jr., Maude's grandson. On January 2, 1960, two days later, Maude executed an agreement whereby she assigned all income from securities in which she had any beneficial interest to petitioners, in consideration of the care, attention, and duties performed on her behalf. Petitioners purportedly agreed to care for Maude in her waning years as a part of the agreement, it *205 being specified that they "have indicated their willingness to continue to care for and look after" 507 Maude for the rest of her life. During the years in question, petitioners reported income which had been assigned to them by Maude, as well as income from their own stock. They received and reported dividend income as follows: *13 TITLE HOLDER
Elizabeth
Maude and
Taxable
Lemmon
Elizabeth
Maude and
Elizabeth
Year
Trustee
Jt. Ten.
Kirk
Lemmon
Petitioners
1961
$3,770.00
$1,745.00
$2,645
$3,812.50
1962
4,190.00
1,940.00
$210
7,175.00
1963
4,273.80
1,978.80
7,318.50 Petitioners did not use any of Maude's income for their own uses and purposes during the years in question. Issue 8 Petitioners furnished Maude the following amounts in the following years: 1961
$3,100
1962
3,300
1963
3,800
In addition to the payments shown above which were used for Maude's general living expenses, petitioners expended other funds on Maude's behalf, these amounting to at least $720.44 in 1961, $199.09 in 1962 and $434.31 in 1963. Maude di not live with petitioners during any of the years in question. Although she lived in an apartment of her own, petitioners reported on their income tax returns that she resided with them in their home each *206 year. Petitioners claimed a $600 deduction for a personal exemption for Maude for each of the years in question on their joint return. Issue 9 In 1963, petitioners' two daughters were students at William Jewell College, and went on the "William Jewell Europe and Holy Lands Tour" sponsored by the college. While in Beirut, Lebanon, they attended the Baptist World Alliance Youth Congress. Not everyone on the tour attended the Congress, but in order to go on the tour, one had to be an alumnus of or a student of William Jewell College. The tour began on July 8, 1963, and terminated August 15, 1963. The Congress lasted from July 15 through July 19 and during that period the girls attended some of the conference sessions and also did some sightseeing in the Beirut area. The tour also visited Paris, Cairo, Luxor, Damascus, Amman, Jerusalem, Tel Aviv, Athens, Rome, Vienna, Zurich, Frankfurt, Heidelburg, London and Amsterdam, and so did the daughters. Petitioners' daughters were selected as "messengers" to the Congress, along with "any others able to go" at a June, 1963 meeting of the Wornall Road Baptist Church. They carried letters from their pastor describing them as delegates to the Congress. *207 Petitioners paid expenses for the tour of $2,963, which represented air transportation, meals, and lodging. They claimed no deduction for this travel expense of their children in their 1963 return but raised the issue of this additional deduction at trial. In his notice of deficiencies the respondent made the following adjustments to income and explanation of adjustments for the three years before us: ADJUSTMENTS TO INCOME - 1961 Taxable income disclosed by return
[1,973.00)
Additional income and unallowable deductions:
(a) Contributions
$ 736.00
(b) Business and travel
3,474.00
(c) Casualty losses
2,322.00
(d) Legal fees
245.00
(e) Homes Asso- ciation assess- ment
24.00
(f) Taxes
8.54
(g) Medical
807.21
(h) Exemption 600.00
8,216.75
Total
$ 6,243.75
Nontaxable income and addi- tional deductions: 0
Taxable income as corrected
$ 6,243.75
EXPLANATION OF ADJUSTMENTS - 1961 (a) The deduction of $1,158.00 claimed as contributions is disallowed to the extent of $736.00 because you have not established that you are entitled to a deduction in excess of $422.00. Therefore, your taxable income is increased in the amount of $736.00. (b) The deduction of $3,963.00 claimed for travel expense has been disallowed to the *208 extent of $3,474.00 because it has not been established that the amount in excess of $489.00 constitutes an ordinary and necessary business expense or was expended for the purpose designated. 508 Therefore, your taxable income is increased in the amount of $3,474.00. (c) The deduction of $2,322.00 claimed for casualty losses is disallowed because you have not established that you are entitled to such a deduction. (d) The deduction of $245.00 claimed as a legal expense is disallowed because you have not established that you are entitled to such a deduction. (e) The deduction of $24.00 claimed as Home Association assessment is disallowed because you have not established that you are entitled to such a deduction. (f) The deduction of $35.00 claimed as personal taxes is disallowed to the extent of $8.54 because you have not established that you are entitled to a deduction in excess of $26.46. Therefore, your taxable income is increased in the amount of $8.54. (g) It is determined that due to a decrease in the amount of your adjusted gross, and to the amount of your medical deduction because you have not established that you are entitled to such deductions, a medical expense deduction *209 of $1,171.79 is allowable in lieu of $1,979.00 claimed on your income tax return. Accordingly, your taxable income is increased in the amount of $807.21. (h) It is determined that the dependency credit exemption claimed on your return for Maude McDaniel is disallowed for the reason that you have not established your right to the credit. ADJUSTMENTS TO INCOME - 1962 Taxable income disclosed by return
[889.00)
Additional income and unallowable deductions:
(a) Contributions
$ 620.00
(b) Business and travel
6,531.00
(c) Casualty losses
1,082.00
(d) Taxes
34.27
(e) Medical
415.16
(f) Exemption 600.00
9,282.43
Total
$ 8,393.43
Nontaxable income and addi- tional deductions: 0
Taxable income as corrected
$ 8,393.43
EXPLANATION OF ADJUSTMENTS - 1962 (a) The deduction of $1,372.00 claimed as contributions is disallowed to the extent of $620.00 because you have not established that you are entitled to a deduction in excess of $752.00. Therefore, your taxable income is increased in the amount of $620.00. (b) The deduction of $7,213.00 claimed for travel expense has been disallowed to the extent of $6,531.00 because it has not been established that the amount in excess of $682.00 constitutes an ordinary and necessary *210 business expense or was expended for the purpose designated. Therefore, your taxable income is increased in the amount of $6,531.00. (c) The deduction of $1,082.00 claimed for casualty losses is disallowed because you have not established that you are entitled to such a deduction. (d) The deduction of $65.00 claimed as other taxes is disallowed to the extent of $34.27 because you have not established that you are entitled to a deduction in excess of $30,73. Therefore, your taxable income is increased in the amount of $34.27. (e) It is determined that due to a decrease in the amount of your adjusted gross income, and to the amount of your medical deduction because you have not established that you are entitled to such deductions, a medical expense deduction of $852.84 is allowable in lieu of $1,268.00 claimed on your income tax return. Accordingly, your taxable income is increased in the amount of $6415.16. (f) It is determined that the dependency credit exemption claimed on your return for Maude McDaniel is disallowed for the reason that you have not established your right to the credit. ADJUSTMENTS TO INCOME - 1963 Taxable income disclosed by return
[2,591.00)
Additional income and unallowable deductions:
(a) Contributions
$ 605.50
(b) Business and travel
8,529.00
(c) Cost of re- turn
100.00
(d) Taxes
18.12
(e) Medical
673.00
(f) Exemption 600.00
10,525.62
Total
$ 7,934.62
Nontaxable income and addi- tional deductions: 0
Taxable income as corrected
$ 7,934.62
EXPLANATION *211 OF ADJUSTMENTS - 1963 (a) The deduction of $1,502.00 claimed as contributions is disallowed to the extent 509 of $605.50 because you have not established that you are entitled to a deduction in excess of $896.50. Therefore, your taxable income is increased in the amount of $605.50. (b) The deduction of $9,111.00 claimed for travel expense has been disallowed to the extent of $8,529.00 because it has not been established that the amount in excess of $582.00 constitutes an ordinary and necessary business expense or was expended for the purpose designated. Therefore, your taxable income is increased in the amount of $8,529.00. (c) The deduction of $100.00 claimed as cost of return is disallowed because you have not established that you are entitled to such a deduction. (d) The deduction of $62.00 claimed as other taxes is disallowed to the extent of $18.12 because you have not established that you are entitled to a deduction in excess of $43.88. Therefore, your taxable income is increased in the amount of $18.12. (e) It is determined that due to a decrease in the amount of your adjusted gross income, and to the amount of your medical deduction because you have not established that you *212 are entitled to such deductions, a medical expense deduction of $66.00 is allowable in lieu of $739.00 claimed on your income tax return. Accordingly, your taxable income is increased in the amount of $673.00. (f) It is determined that the dependency credit exemption claimed on your return for Maude McDaniel is disallowed for the reason that you have not established your right to the credit. By their petition the petitioners have assigned error with respect to most of these adjustments. They specifically allege that the business and travel expenses claimed were ordinary and necessary expenses incurred and paid in connection with petitioners' business; they allege that in 1961 petitioners sustained casualty losses from an automobile accident and the theft of personal property in the total amount of $2,322 and that in 1962 they sustained casualty losses arising from damage to their personal residential property caused by an overloaded truck and some theft losses of personal property in the amount of $1,082. About the only items of adjustment not contested in the petition are taxes in the amount of $34.27 disallowed for 1962, and "cost of return" of $100 and taxes of $18.12 disallowed *213 for 1963. By amended petition the petitioners claimed that they overstated their dividend income in their returns for the years 1961, 1962 and 1963 by the respective amounts of $4,642, $5,370 and $5,479.10. At time of trial the petitioners made the additional claim and contention that they were entitled to further deductions for charitable contributions because of a worldwide trip made by their two daughters during which trip the daughters, then in college, attended a Baptist Youth World Conference held for a few days in 1963 at Beirut, Lebanon. By second amendment to petition the petitioners raise this claim to an additional deduction for a charitable contribution in the amount of $2,963.40 for 1963 and alternatively claim that the expenses of travel in 1963 to Texas on three occasions originally claimed as business expenses were deductible as ordinary and necessary expenses incurred for the production or collection of income and the management, conservation or maintenance of property held for the production of income under section 212 of the 1954 Code. [2]
Various concessions were made by the *214 parties by stipulation. The petitioners concede that they are not entitled to deduct $960 in 1962 and 1963 which they claimed in their tax returns for those years as part of business and travel expenses and reflected in their records as additions to "Reserve-Deprc. & Cont." It is agreed by stipulation that petitioners have made payments to various charities "which qualify as approved charitable institutions" in the following amounts: Taxable Year
Charitable Contributions
1961
$464.50
1962
905.00
1963
948.50
It is also stipulated that in 1961 the petitioners sustained an allowable casualty loss in an automobile accident and are entitled to a deduction therefor in the amount of $310.29 and that petitioners incurred and paid investors expenses in the amount of $806 for the taxable year 1961 which they deducted as a casualty loss. Of the investors expenses mentioned, $403 was later refunded to petitioner and one-half of the net of $403 expended was attributable to stock owned by Maude W. McDaniel. Therefore, petitioners are entitled to an investment expense deduction of $201.50 in 1961. It is also conceded that petitioners are entitled to an investment expense deduction of $245 for legal fees *215 paid in 1961 and that 510 the deduction of $24 claimed for that year for Homes Association assessment is not deductible. By further stipulation of the parties it is agreed that petitioners are entitled to a deduction for "personal taxes" of $35 for the year 1961 and for "other taxes" of $30.73 and $63.19 for the respective years 1962 and 1963. Petitioners concede that the amount of $100 claimed as a deduction for the year 1963 "Cost of Ret." is not deductible. Sidney claimed this amount as a deduction for his own services in preparing his joint tax return for that year. Opinion Petitioners have presented the Court with a conglomeration of issues. We are asked to conclude that a "business" which obviously has never been profitably operated is actually a business operated for profit, and simultaneously to examine the taxation aspects of claimed casualty, charitable and medical expense deductions and an assignment of income problem. A bizarre combination of factual issues has skillfully been combined with issues of law. Sidney Lemmon's attitude toward the Federal income tax is not one which can be considered admirable. The record before us convinces us that he deducts almost every cent *216 he spends, and some he does not, labeling them all as expenses of his almost nonexistent business. He pays his daughters salaries for doing approximately nothing and deducts them; he pays himself nothing for preparing his tax returns and deducts $100 for "Cost of Ret."; he travels all over the country without ever making a sale and deducts the expenses of his trips, even including his wife's expenses when she goes along; he claims that a truck cracked his driveway and deducts a phenomenal amount for its entire replacement in the wrong year; he uses areas of his home as a purported office for his inactive and profitless business and deducts "rent"; he purchases silver, china, glassware, luggage, blankets, household items, jewelry, et cetera, none of which items he sold to any customers in the years before us, and claims the cost as a business deduction for research and development; at trial having given up on disallowed charitable deductions, he seeks a substantial additional charitable deduction for expenses of sending his daughters on a 5-week trip abroad during which they attended a young folks' church meeting for parts of four or five days, and so forth and so on, endlessly. The *217 bulk of the issues presented to us for adjudication by Sidney Lemmon are representative of his rather grotesque attitude toward the Federal income tax. We find it impossible to give any credence to Sidney's testimony. We observed him most carefully upon the witness stand and found him entirely unconvincing. He constantly evaded even the simplest of questions in order to avoid the obvious answer; he insisted upon clinging to many inconsistent statements even when faced with their mutual exclusiveness. He recalled the slightest detail when an expenditure was involved which might decrease his tax liability but remembered little about items which would dictate a different result. He was not a convincing or credible witness and was far from candid. Sidney himself by his demeanor and performance on the stand has left us with no alternative but to disregard the bulk of his voluminous testimony, which in turn constitutes the bulk of petitioners' evidence. We just do not regard Sidney's testimony as reliable or trustworthy evidence. Issue 1 Sidney's deductions taken during the years in question relative to his promotional aids venture were disallowed by respondent to the extent that they exceeded *218 gross business income. We agree with the Commissioner that they are not deductible, and the disallowance must be upheld. In order for this Court to allow a deduction under section 162, petitioner must establish that he carried on the alleged business with at least some expectation of a profit. The state of mind of the taxpayer must be examined to determine whether or not that all-important expectation of profit actually existed. It is not necessary that the profit expectation even be reasonable; it merely need be shown that the taxpayer had a bona fide expectation of realizing a profit. Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967). The principle which must be applied in situations such as this was aptly stated by Judge Learned Hand in Thacher v. Lowe, 288 F. 994, 995 (S.D.N.Y., 1922): It does seem to me that if a man does not expect to make any gain or profit * * * it cannot be said to be a business for profit * * * Unless you can find that element it is not within the statute * * * Thus, the existence of a profit motive on the part of the taxpayer is a requisite 511 element to his overcoming the presumption which has attached to the Commissioner's *219 disallowing the deduction. We feel that respondent herein has bolstered his presumption by pointing out the long history of losses in the venture, the entire disproportion of receipts to expenditures, and the general business knowledge of the petitioner. No one of those elements alone is conclusive but viewed together are convincing that Sidney, in good faith, did not expect to make a profit from his home-operated venture in the years before us. Without such expectation, we must hold that the respondent's disallowance of the expense deductions related to the venture is correct. Henry P. White, 23 T.C. 90 (1954) affd. 227 F. 2d 779 (C.A. 6, 1955). Issue 2 Respondent has also disallowed the expenses incurred by petitioners on their three trips to Texas in 1963 alleged to be relative to the land inherited by Sidney from his father many years ago. The deductions were claimed at first as part of Sidney's business expenses but are now alternatively grounded first upon curing the ad valorem tax liability which existed at the time of the first trip, and second upon petitioners' alleged efforts to find a productive and income-producing use for the land. Petitioners argue that such expenses *220 are deductible under section 162, or alternatively under section 212. Before an expenditure may be deducted under either section, petitioners must show the expense to be ordinary and necessary. On the first trip, petitioners, both Sidney and Elizabeth, drove from Kansas City to Cotulla, a 10-day trip as they made it, in order to pay, immediately upon arrival, the minuscule ad valorem tax liability of $32.71. We do not believe that the trip was made for business purposes or that the cost of the leisurely trip to Texas was an ordinary or necessary expense in light of the small sum due and the other evidence of record. We hold that no deduction can be allowed on that basis. Sidney then allegedly formulated the idea of making investigations into the possibilities of using the land for agricultural uses or petroleum production. Petitioners thus attempt to ground part of the expenses for the first trip and all the expenses for the other two trips on that investigatory purpose, and allege the deductions are allowable under section 162 or, alternatively, under section 212. As we pointed out above, the existence of a profit motive is necessary to sustain a deduction under either of those sections. *221 Petitioners bear the burden of proof to show the existence of such an expectation. We hold that they have failed to do so. Not only were the details of the action taken by Sidney to cultivate the profitable nature of the land unbusinesslike and shallow in both quality and quantity, but Sidney's entire modus operandi does not serve to bring to light the existence of any profit motive. The land was unproductive, for years had been non-income producing and remained so. Thus, petitioners have failed to bear their burden of proof by showing any reasonable or existing expectation of profit. We hold that petitioners' trips to Texas were for private purposes, probably for pleasure and relaxation, and that the payment of overdue taxes and the prospective development of the land was an afterthought by Sidney in order to claim that the expenditures are deductible. We must sustain the respondent's disallowance of them as deductions under either section 162 or section 212. Issue 3 Sidney has alleged the existence of a partnership with T. L. Rhoades during 1958 and 1959, which ended with Rhoades owing Sidney a debt of $748.98, and later reduced to $671.89 by crediting commissions due Rhoades. Not *222 only was there insufficient proof that the partnership ever existed, but there was no credible proof of the existence of the debt or of the event or time of alleged worthlessness. The only evidence presented was Sidney's own vague, general and evasive testimony and the rather skimpy records he kept. We have commented on Sidney's poor credibility and unconvincing testimony. We hold that petitioners have not borne their burden of proof, and therefore the alleged debt originally claimed as a casualty loss is not deductible by petitioners in the year claimed, 1961. Issue 4 A truck delivering firewood drove into petitioners' driveway in 1960, causing alleged damage to the concrete surface. The deduction, however, was not taken until 1961 or 1962, the record being completely confused as to when the deduction was claimed. Section 165 dictates that a deduction shall be allowed for any such loss "sustained during the taxable year * * *" The regulations (section 1.165-1(d)(1)) explain that the loss 512 is considered "sustained" in the taxable year "in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year." *223 The deduction was allegedly taken in 1961 because the freezing and thawing of that winter further disintegrated the driveway and made the destruction more obvious that year. Although the truck entered the driveway in a prior year, the subsequent freezing made the loss complete. Again the evidence is completely confusing and contradictory about the year involved. Petitioners allege that they deducted $1,375 which Sidney felt represented the diminution in fair market value. We are unable to determine the year in which they allegedly claimed this loss. The figure was determined by an estimate obtained in February of 1963 for replacing the driveway which was then at least 12 years old. Therefore, if this estimate were the basis of the claimed loss it must have been used in connection with the casualty loss claimed for 1962. However, only a total of $1,082 was claimed for casualty losses for that year and included therein were other items. As indicated in our findings, the petitioner alleges that the loss took place in 1962. At trial and thereafter it is urged that it be allowed for 1961. No credible evidence was introduced to show that the property involved suffered a diminution in fair *224 market value of $1,375 from the cracked driveway which is still being used. The regulations (section 1.165-7 (a)(2)(ii)) allow "cost of repairs" as acceptable evidence of the loss of value. However, we feel that the $1,375 figure does not meet the requirement of the regulation involved because it is a "cost of replacement" figure rather than a "cost of repairs" figure and there is no evidence that the contemplated new driveway and curbings were the same as the old ones being replaced or that the cost estimated was the same in 1961 or 1962. In addition, the regulation establishes certain criteria which must be met in order to use the cost of repair as evidence of the loss of value; those criteria were not met by petitioners. Thus, petitioners have failed to meet their burden of proof in that they have not established the year of the alleged casualty loss nor the amount of the loss of value resulting from the damaged driveway. Respondent's disallowance of the large casualty losses claimed and not otherwise substantiated must be upheld for both years except as herein otherwise specified. Issue 5 Respondent disallowed a deduction for a wrist watch allegedly stolen from Sidney's car in *225 1962. Sidney's uncorroborated and general testimony remains as the only evidence introduced on the point. He allegedly reported the theft to police but no evidence of this to substantiate his own self-serving, vague and general statements was produced. Having already discussed Sidney's poor credibility, we are left with no choice but to sustain respondent's determination that the deduction cannot be allowed because it has not been substantiated. Even if we were to conclude that the loss had been established in the year claimed the evidence as to fair market value of the watch is not sufficient to establish the extent of the loss. Issue 6 During the years in question, petitioners took sizeable deductions for medical expenditures incurred by them. Respondent disallowed a part of those deductions because petitioners failed to establish that they had not been reimbursed for their expenditures. Section 213 allows a deduction for such medical expenses as are "* * * not compensated for by insurance or otherwise." The burden to prove absence of such compensation is upon the petitioners. If petitioners fail to prove that they were not compensated, the deductions cannot be allowed under the *226 statute. Goodman v. Commissioner, 200 F. 2d 681 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court. Petitioners have not in fact offered any credible evidence tending to prove that they were not reimbursed. Sidney held at least six health and accident policies during the years in question. His evasive attitude on the witness stand reached its peak during his testimony on this issue as he quibbled, parried and ducked; he failed to remember being reimbursed to any extent. However, after being shown letters from two insurers revealing substantial reimbursements, he grudgingly recalled them vaguely. Sidney's memory again failed him, and he was not able to recall receiving any further reimbursements. Sidney's inability to remember further reimbursement is insufficient to overcome his burden of proof. Petitioners have not established that they were not 513 reimbursed in full nor the extent to which their medical expenses were paid if not completely. We must sustain respondent's disallowance of this deduction because of petitioner's failure of proof. Issue 7 Maude McDaniel, Elizabeth Lemmon's elderly mother, was quite ill during the years in question; she died at age 91 in 1966. *227 On December 31, 1959, she created a revocable trust, reserving also the power to alter or amend same at any time, with Elizabeth as trustee. She placed therein certain shares of stock as reflected in our findings. Two days later by an agreement with petitioners dated January 2, 1960, she purportedly assigned "all income from securities in which I may have a beneficial interest" to Elizabeth and Sidney. Although petitioners reported both the income from the trust and other income in which Maude had an interest on their returns during the years in question, they either distributed it to Maude or applied it for her benefit, paying her bills and expenses. The parties have stipulated that petitioners furnished Maude with $3,100 in 1961, $3,300 in 1962, and $3,800 in 1963. In addition, they paid other substantial bills with her funds. None of the income from the trust or from Maude's other dividend income was paid to or used by petitioners for their personal benefit or purposes. The amounts in question are as follows: 1961
1962
1963
Income from the trust of which Elizabeth was Trustee
$3,770
$4,190
$4,273.80
Income from the stock which Maude held jointly with Elizabeth [1]
872
970
989.40
Income from the stock Maude held with Kirk McDan- iel, Jr. 0
210
0
Total $4,642
$5,370 [2]
$5,263.20
*228 The trust of which Elizabeth was trustee filed no fiduciary returns and the record does not establish whether or not Maude filed returns herself. We seriously question that she did. Respondent does not dispute here that one-half of the amounts received from the jointly held stock, and all of the amounts received from the stock held in trust are taxable to Maude. Respondent contends, however, that these amounts are also taxable to petitioners as payments under a support agreement. Petitioners now contend that the amounts shown above were incorrectly reported by them. Citing Helvering v. Horst, 311 U.S. 112 (1940), they argue that an assignment of income without a corresponding transfer of the property giving rise to the income will not result in a transfer of taxability. They also urge that there was no valid or enforceable support agreement; that there was no obligation on petitioners to render future *229 services to Maude. Therefore, petitioners contend that they should have reported only an amount equal to one-half the dividend income from the stock Elizabeth held jointly with Maude, and none of the income from the trust or from the Maude-Kirk, Jr., jointly owned stock. Respondent on the other hand contends that the assignment agreement in issue is a valid support agreement. He argues that the beneficial interests in the various securities were exchanged for a valid consideration, and therefore the income was correctly reported by petitioners. Examination of the agreement in question in the light of all other evidence of record reveals the untenable nature of respondent's position on this issue. The consideration involved is "* * * the care, attention and many duties performed for me * * *" It is doubtful that the vague language following that petitioners had "indicated their willingness to continue to care for and look after" Maude would be sufficient to obligate them to support her henceforth. The so-called assignment speaks only in terms of the income from securities; Maude continued to own all of her own stock as before and she had reserved power to alter, amend or revoke the *230 simultaneously executed trust agreement. Maude was ill and not capable of caring for herself or looking after her affairs. The 514 agreements were obviously executed to allow petitioners freedom in administering Maude's property and spending her income on her behalf during her declining years, and to provide how the property would be divided upon her death. Both prior to and following the execution of the agreement, petitioners cared for Maude and attended to her personal and business affairs because she was Elizabeth's mother. The assignment agreement in issue while in form an assignment of income with a suggestion of an obligation of support is in substance a power of attorney permitting petitioners to collect and disburse Maude's income and to thereby care for Maude with her own funds. The funds were used accordingly for Maude and not for other uses and purposes. Maude realized the fruits of the income just as if she herself had received the income and handed it over to petitioners to administer on her behalf. The assignment agreement cannot be regarded as a support agreement in view of all of the circumstances and cannot serve to attach tax liability to petitioners. Maude alone *231 received full enjoyment of the income, just as if the agreement had never come to exist, and petitioners were merely acting on her behalf in managing her financial affairs. The income therefore was incorrectly reported by petitioners and the evidence of record convinces us that petitioners must prevail on this issue. Petitioners' gross income should be reduced by the amounts which allegedly accrued to them under the purported assignment agreement: All of the trust income and one-half of the income from Maude's jointly held securities. It should be further reduced by the one-half of Kirk, Jr.'s share of the securities he owned jointly with his grandmother, all of which was also reported by petitioners in their return for 1962. Issue 8 Petitioners took a deduction in each of the years in question for a personal exemption because of the funds they expended to support Maude. Since we have decided that petitioners incorrectly reported the assignment income which should in fact have been reported by Maude, we must also conclude that Maude had income in excess of $600. Section 151(e)(1)(A) allows a deduction if the income of the dependent was less than $600. Thus, we must disallow the deductions *232 taken by petitioners for Maude. Petitioners concede that this properly would follow from a resolution of the assignment income issue in their favor. Issue 9 In 1963, petitioners deducted $1,502 as charitable contributions under section 170. Respondent disallowed $605.50 of this amount because petitioners had not established their right to a deduction in excess of $896.50. It has now been stipulated that petitioners have substantiated $948.50 of charitable contributions which should be allowed for 1963. At trial petitioners claimed an additional contribution deduction of $2,963.40 representing expenses of their two daughters in attending an overseas church meeting. They however presented no evidence as to why respondent's disallowance of a portion of the amount originally claimed should not be sustained to the extent of the disallowance which exceeds the stipulated amount. On brief they concede that the additional claim for their daughters' trip to Lebanon should be limited to $2,051.20, the cost of round-trip transportation and one week's cost of food and lodging abroad instead of the 5-week total cost of these items. Petitioners' two daughters had attended a 4- or 5-day Baptist *233 World Alliance Youth Congress at Beirut, Lebanon, while on a 5-week tour of Europe and the Holy Lands sponsored by their college. It is therefore contended that the cost of the trip for the two girls and their expenses for one week of the five for food and lodging should be regarded as a deductible contribution to their church. Under certain circumstances the Commissioner of Internal Revenue has recognized unreimbursed traveling expenses, including the cost of meals and lodging, while away from home on the affairs of a church can constitute an expenditure qualifying for the charitable deduction. Rev. Rul. 55-4, C.B. 1955-1, 291. See also sec. 1.170-2, Income Tax Regs. To prevent abuse of this rather broad interpretation, the Commissioner has narrowed the field of those who may qualify by requiring that any lay member must be an actual delegate to a convention in order to deduct his unreimbursed expenses. Rev. Rul. 58-240, C.B. 1958-1, 141. The Commissioner has likewise ruled that one who attends a church meeting merely as a member of the church has no right to the deductions claimed similar to the right of a duly selected delegate. Rev. Rul. 61-46, C.B. 1961-1, 51. 515 The Lemmon *234 sisters attended the Congress as "messengers" of their church, but nearly anyone could have gone to the Congress and achieved such status. The minutes of the church meeting at which three messengers were selected, named those three and "any others able to go." Their status was actually that of church members or volunteers at the Congress, rather than selected delegates to render actual service to the church by virtue of their attendance or to represent the church in deciding issues or questions on which a vote might be taken. A duly selected delegate is in a position to render a quantum of service sufficient to permit a deduction. Here, however, petitioners' young daughters had no duties assigned to them and apparently no power or authority to act for the church back home. Anyone else who elected to go would have had the same status as a "messenger." They obviously performed little service for the church and although their pastor's letters which they carried called them "delegates" we cannot conclude that they were such in the usual sense of the term. Obviously the trip expenses were not solely attributable to the rendition of charitable services. See Rev. Rul. 58-240, supra. The *235 entire 5-week tour cost was $2,963.40. Petitioners have now reduced their claim and would deduct $2,051.20 for a 4- or 5-day Youth Congress which their daughters attended part of that time as "messengers" from their church along with "any others able to go." We cannot conclude on the evidence presented that the expenses of the trip here involved were directly connected with and solely attributable to the rendition of volunteer services to the church. We, therefore, must disallow the deduction sought for the charitable contribution of these expenses. Petitioners' daughters were not "delegates" or duly chosen representatives of their church congregation rendering service to the church in the sense necessary to qualify the unreimbursed expenses for deduction, but were merely coincidentally attending in accordance with their privileges as members of the church while they were on a 5-week trip abroad as members of their college tour. The deduction must be denied. Decision will be entered under Rule 50. Footnotes
1. Apparently a mathematical error of $10 was made by the parties.↩
1. There is much conflict and contradiction in the record concerning not only the amount of the deduction, but also the year of the loss and the year the deduction was claimed. In their petition it is alleged that the casualty loss claimed for 1962 included the damage to the driveway. In 1961 the casualty loss claimed was $2,322 and in 1962 it was $1,082. The makeup of these claimed deductions is not clearly established by the evidence, but petitioner's summary of his records reflects the following for 1961: ↩
Casualty Losses
Indem. Bond
$ 806
Bad Debt
672
Car Wreck Rep
513
Gen. Mat. Exch 331
$2,322
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
1. The figures shown for this category are equal to one-half the total dividend paid. It is not disputed that Elizabeth correctly reported her half. ↩
2. Petitioner overstated this amount in his amendment to petition by $215.90. The stipulations indicate that this figure is the correct one.↩