REX B. FOSTER, JR., AND BARBARA FOSTER, Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent
Foster v. Commissioner
Docket No. 165-71.
United States Tax Court
T.C. Memo 1973-14; 1973 Tax Ct. Memo LEXIS 272; 32 T.C.M. (CCH) 48; T.C.M. (RIA) 73014; January 23, 1973, Filed *272 HELD: Despite large losses suffered during the years in issue and subsequent years, petitioners were engaged in the business of raising and breeding Tennessee Walking Horses during the five years in issue because these years were the formative years of the business and because petitioners evidenced an intent to make a profit from the sale of foals in the future. Marion Hirschburg, for the petitioners. Robert J. Murray, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION
IRWIN, Judge: Respondent determined the following deficiencies in petitioners' income taxes: Year
Deficiency 1964
$7,181.35
1965
20,174.27
1966
9,952.83
1967
21,626.12
*273 2 We must decide whether petitioners were engaged in the business of breeding and raising Tennessee Walking Horses (hereafter "walkers") during the years in question and were entitled to deduct from other income the losses incurred from such operation. If we decide that petitioners were not so engaged, we must then determine whether respondent has the right to readjust petitioners' base period income for the taxable years 1962 and 1963 for the purpose of computing their averageable income for the taxable years 1964, 1965 and 1967, even though assessment and collection of the additional tax liabilities determined for 1962 and 1963 are barred by the statute of limitations set forth in section 6501 of the Code. [1] In any event, because of certain concessions made by the parties, a computation under Rule 50 will be required. FINDINGS OF FACT The petitioners are husband and wife who at the time their petition was filed resided in Waterloo, Iowa. They filed their joint Federal income tax returns for the years 1964 through 1967, inclusive, with the district director of internal revenue *274 in Des Moines, Iowa. Rex B. Foster, Jr. (hereafter Dr. Foster) is a dental surgeon. His wife, petitioner Barbara Foster, is a 3 graduate of Northwestern University.During the taxable years petitioners had three dependent children, daughters Teresa and Jennifer, and son Rex III. During the taxable years Dr. Foster practiced oral surgery in Waterloo as a member of the partnership known as Foster and Foster. Also, during these years, petitioners lived at Rangemore Farms, Walking Horse Division, R.R. #4, Waterloo, Iowa. Petitioners reported gross operating receipts from their horse raising activities, net operating losses from such activities, and partnership income from Dr. Foster's oral surgery practice on their income tax returns for the years 1963 through 1970 in the following amounts: Schedule C B. Foster, Jr.'s
Gross
Distributable Year
Gross Receipts
Expenses
Net Losses
Rex B. Foster, Jr.'s Distributable Share Of Partnership Income 1963
$915.00
$9,410.38
$8,495.38
$ 28,217.28
1964
1,196.00
17,989.25
16,793.25
45,280.61
1965
810.50
17,702.14
17,091.64
48,241.15(a)
1966
558 .00
19,332.27
18,774.27
45,197.15(a)
1967
1,820.98(b)
14,697.58
12,876.60
57,998.14(a)
1968
2,193.03
18,564.03 16,371.00
75,505.13
1969
886.44
17,887.83
17,001.39
71,608.55
1970
1,908.16
16,966.28
15,058.12
65,380.16
$10,288.11
$132,549.76
$122,461.65
437,428.17
*275 (a) Dr. Foster's distributable share of partnership income for the years 1965, 1966 and 1967 has been increased from the amounts reported on the returns for those years to $48,907.68, $49,808.07 and $63,813.36, respectively. (b) It should be noted that the Schedule C income reported for the year 1967 was derived from the sale of beans and Government aid for constructing a watering pond. Consequently, petitioners' income for their horse raising activities for that year would be zero, and their losses would equal their expenses - $14,697.58. 4 During the taxable years in issue, petitioners incurred expenses in connection with their Tennessee Walking Horse operations as follows: 1964
1965
1966
1967
Payroll Taxes
$34.83
$32.41
$ 112.64
Rent
1,200.00
1,013.50
Repairs
121.55
759.16
1,521.65
1,124.10
Salaries
993.08
952.39
1,901.72
2,142.70
Insurance
400.00
1,127.50
1,234.50
1,226.75
Commissions
19.00
Small Equipment and Expense
349.67
Feed
932.94
542.69
1,406.90
1,083.12
Hay
239.50
291.00
Training
3 ,511.03
3,690.82
5,361.13
2,039.56
Veterinarian
283.70
437.17
641.52
380.85
Shoeing
824.25
405.75
425.20
372.00
Trucking
1,131.43
1,080.43
451.97
Advertising and Memberships
1,112.59
377.63
356.77
73.00
Show Travel
1,789.97
1,479.63
435.85
956.68
Show Expense
651.50
1,501.29
1,042.27
Interest
1,248.19
573.76
Telephone
111.26
133.54
Baling
157.50
Fertilizer & Seed
221.06
Signs
30.90
Miscellaneous
117.68
177.25
$14,592.24
$14,060.04
$15,464.50
$ 10.231.65
Depreciation
3,397.01
3,642.10
3,867.77
4,465.93
Total
$17,989.25
$17,702.14
19,332.27
$14,697.58
*276 In addition to the Schedule C losses reported by petitioners during the years 1963 through 1970, they reported Schedule D gains and losses (gains and losses resulting from sales of purported capital assets) in the following amounts: 5 Year
Gain or Loss
1963
($ 1,300,25)
1964
(665.00)
1965
(2,032.50)
1968
(657.50)
1969
250.00
1970
(1,715.00)
Net Loss
($6,120.25)
Dr. Foster became interested in horses in 1955 when his father began raising Shetland ponies. During 1962, petitioners' initial purchases of horses were made (seven quarter horses and one unregistered Tennessee Walking Horse). These animals were kept at a barn and pasture on a farm rented from Dr. Foster's father. Petitioners, however, disposed of these initial purchases within one year from the date of their acquisition. The next year, 1963, was the one in which petitioners decided to breed Tennessee Walking Horses. These horses were not, at the time, commonly bred in Iowa and were just beginning to be shown there. Petitioners felt that the walkers, which were popular elsewhere, could achieve similar favor in Iowa and would secure another avenue of family income should injury *277 in the future prevent Dr. Foster from further practice of oral surgery. These horses were a gentle breed, typically known for their three gaits (flatwalk, fast flat-walk, and canter) and capable of satisfying a buyer's desire for either a pleasure or show animal. To insure development of the walker's gaiting abilities, these 6 horses would have to be worked and cared for on a daily basis. After deciding to embark on the walker venture but prior to any investment therein, Dr. Foster visited reputable walker breeders and trainers in Tennessee and Arkansas to seek their advice about starting such an enterprise. One of the trainers he contacted was Jack Warren of Springhill, Tenn., who very shortly thereafter became petitioners' trainer and adviser with respect to his walker activity. The property which petitioners had been renting from Dr. Foster's father became the situs of petitioners' horse raising activities. In 1963 petitioners sold their home in Waterloo and moved to this 22.8 acre farm. They continued to rent the land until October 1965, at which time they purchased it. In 1967 petitioners purchased an adjoining 26 acres for horse pasture. Prior to 1965 Dr. Foster's *278 father had equipped the house on the original 22.8 acres with a new furnace, constructed a new well, and remodeled the house's kitchen. He also had put asphalt tiles on the floor. The land also had on it a barn, a shed, and a corn crib. The exterior dimensions of the barn were approximately 54 by 58 feet in length. After petitioners purchased the property, they made their own additional improvements: they remodeled the barn 7 to provide stalls for their horses; fences on the land were replaced; and a training ring was constructed. Although the record is unclear whether this ring was located inside the barn or on the exterior premises of the farm it appears to have been an outside ring. This acreage contained no special hunting or fishing facilities and petitioners did not utilize this acreage for more than the usual amount of entertaining of close personal friends. It was somewhat inconvenient for the Fosters to live in the country. The farm was located eight miles south of Waterloo where Dr. Foster's denistry practice was located and where most of petitioners' friends resided. The farm was also quite a few miles from the three hospitals Dr. Foster had to frequent *279 in connection with his oral surgery practice. Petitioners' horse raising operations were conducted under the name of "Rangemore Farms, Tennessee Walking Horse Division." During the years 1964, 1965 and 1966 petitioners advertised their horses in a number of farm magazines. They did not advertise their stock in 1967, however, because all of their top show mares and stallions were retired as breeding foundation stock and were not for sale. During the years in issue Dr. Foster personally maintained a single-entry set of books for petitioners' horse 8 raising activities which adequately reflected their income and expenses. During the taxable period, Dr. Foster spent two to three hours daily working with his horses even though he was a partner in a busy oral surgery practice. His wife contributed to the venture by doing whatever her husband could not find the time to accomplish: such as cleaning the stalls and equipment and washing and mending horse blankets. Mrs. Foster also went to Tennessee to learn the art of shoeing walkers. There was a shortage of competent shoers in Waterloo and Mrs. Foster's expertise in this respect was of great help to the operation. All of *280 petitioners' walkers were trimmed and shod under Mrs. Foster's supervision. Petitioners' daughter, Jennifer, spent much time with the horses and with her father rode and showed their horses at various horse shows in the Midwest and the National Walking Horse Celebration at Shelbyville, Tenn. The other two children also performed chores relating to the horses. Petitioners won a number of ribbons and trophies at shows which they attended, including three prizes at the National Celebration. The "Rangemore" banner flew over the stalls where petitioners' horses were housed during these shows but when petitioners' horses were announced prior to their performance in the show rings, the ownership of the horses was often announced as "Mr. and Mrs. Rex B. Foster of Waterloo, 9 Iowa," and not "Rangemore Farms, Tennessee Walking Horse Division." Prior to 1963, when petitioners moved to the rented farm in the country, they employed a young man as trainer for their horses. The young man, however, did not follow training instructions proffered by Jack Warren and he was discharged in 1963. From that point on, Warren trained petitioners' horses during the summer months at his Tennessee *281 farm. The horses spent the winter months at petitioners' farm in Iowa. The training expenses incurred during petitioners' taxable period herein were primarily paid to Warren. Petitioners owned mares 3 years old or older during the years in question as follows: Year
Mares
1964
3
1965
4
1966
3
1967
5
Typically, walker breeders do not allow their mares to breed until after the age of three. This prevents stunting the growth of the mare or having the new colt be a runt. The gestation period for walkers is 11 months. Petitioners' inventory for the years 1964 through 1967, inclusive, is as follows: 10 December 31, 1964 - 7
Sex
Age
Sun Dust Angel
M
3+
Merry's Choice
M
3+
Holiday's Miss Kitty
M
3+
Mr. Hawkeye F
G
Go Boy's Lenore
M
2
Go Boy's Bandit
S
Mr. Raven F
S
December 31, 1965 - 8
Merry's Choice
M
3+
Holiday's Miss Kitty
M
3+
Mr. Hawkeye F
G
Go Boy's Lenore
M
3
Go Boy's Bandit
S
Mr. Raven F
S
Tombstone's Princess
M
1-
Stardust WTB
M
3+
December 31, 1966 - 8
Sex
Age
Merry's Choice
M
3+
Holiday's Miss Kitty
M
3+
Mr. Hawkeye F
G
Go Boy's Lenore
M
3+
Go Boy's Bandit
S
Mr. Raven F
S
Tombstone's Princess
M
Yearling
Mack K's Trojan Horse
G
December 31, 1967 - 11
Merry's Choice
M
3+
Holiday's Miss Kitty
M
3+
Mr. Hawkeye F
G
Go Boy's Lenore
M
3+
Go Boy's Bandit
S
Mr. Raven F
S
Black Lady Nodder
M
3+
Ebony's Sensation F
S
Colt
Beulah's Choice
M
3+
Tombstone's Princess
M
2
April Starlight
M
2
M = Mare
G = Gelding
S = Stallion
*282 Jack Warren, expert walker trainer and in this case the trainer of petitioners' horses during the summer, testified that development of a good breeding stock of walkers takes from 10 to 12 years. During the course of that development, he added, the losses incurred by the breeder should decline even though it would take a while for the profit to result. Further, Warren opined that the market for walkers was in somewhat depressed state although he expected brighter days ahead. Warren had also advised petitioners during the taxable years to hold their stock and not sell until their herd was firmly established. At the time of trial he believed they had reached the point where they could start selling their foals. Petitioners then had an inventory of 18 horses. 11 The record does not indicate whether petitioners trained their horses to any extent during the long winter months in Iowa. Neither was a member of the Trainers Association, an organization consisting of walker experts who have been in the business long enough to be a trainer and to know what walkers are supposed to do. (Jack Warren was a member of this organization.) Petitioners were members of the Tennessee *283 Walking Horse Association and the American Horse Show Association. They subscribed to trade magazines such as Saddle and Bridle, National Horseman, and Voice of the Tennessee Walking Horse. Petitioners did sell the following animals during the years in question: Year
Name
Registered
$1964
Queen of Go Boy
Yes
1964
Tombstone
Yes
1964
Spurs Merry Lady
Yes
1964
Rangemore Yankee Comm.
No
1965
Sun Dust Angel
Yes
1965
Tops' Ace of Spades
Yes
1966
Stardust WTB (a)
Yes
1967
Mack K's Trojan Horse
Yes
(a) Stardust WTB was traded for Mack K's Trojan Horse
OPINION
It is well established that breeding, raising and training horses for sale may constitute a trade or business. Wilson v. Eisner, 282 F. 38 (C.A. 2, 1922). Nevertheless, an activity may not be classified as a trade or business 12 unless a taxpayer can prove that he had a bona fide intention of making a profit therefrom. It is not necessary, however, that the expectation of profit be a reasonable one, as long as it is genuine. Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967). In any event, this issue is *284 essentially a question of fact to be decided upon the particular circumstances of each case. Margit Sigray Bessenyey, supra. Upon extensive examination of the facts and circumstances in this particular case, we hold that petitioners were in the business of breeding and raising Tennessee Walking Horses because their expectation of making a profit from this activity was genuine. Although respondent has noted a number of shortcomings in petitioners' operations, particularly with respect to the training the horses received during the winter months, we are more impressed by the positive steps taken by petitioner toward making a profit. Respondent's criticisms are, of course, made with the clear vision of hindsight. A history of losses over a period of years may be an important factor bearing on a taxpayer's true intention; but the "presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation * * *." Margit Sigray 13 Bessenyey, supra at 274. The years before us are only the initial part of the long period necessary *285 to develop a profitable stable of walkers. Although the level of petitioners' losses remained steady from the years in issue until the time of trial, petitioners did develop their stock to the point that they could begin selling their foals. We believe that petitioners' development of good breeding stock within about eight years, a period somewhat shorter than usual for walking horses, indicates that they were serious in their endeavor to make a profit from their horse breeding operations. A number of other factors weigh in petitioners' favor. Dr. Foster sought out and used expert advice in the conduct of his business. The horses were trained by an established trainer. Petitioners were exceptionally knowledgeable about walkers, and their search for knowledge went beyond the bare essential of subscribing to trade publications. Mrs. Foster, for example, learned how to shoe the walking horses when petitioners discovered a lack of competent shoers in their area. An important factor benefitting petitioners is that Dr. Foster personally spent two to three hours attending to his horses every day despite the demands of his dental practice. We also note that petitioners kept adequate *286 books and records for their horse business and that they operated under a trade name in most instances. 14 Although not bearing directly on petitioners' business motives, a number of other factors indicate that petitioners' ownership of horses was not primarily for pleasure or recreation. First petitioners lived on the farm where the horses were kept even though the location of the farm was somewhat inconvenient for Dr. Foster's dental practice. Second, petitioners' farm did not have unusual or extensive recreational facilities, and petitioners did not do a great deal of entertaining on the farm. Finally, petitioners owned more horses than might reasonably be used by a family of five merely for recreation. Our holding that petitioners were engaged in the business of raising and breeding Tennessee Walking Horses makes the losses incurred by them for the years in issue deductible. This holding in petitioners' favor obviates the necessity of considering petitioners' alternative argument that respondent incorrectly applied the averaging provisions (sections 1301-1305) in determining the deficiencies against petitioners. But See Robert W. Unser, 59 T.C. (Jan 8, 1973), dealing *287 with the precise issue raised by petitioners. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩