WOODROW L. WROBLEWSKI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wroblewski v. Commissioner
Docket No. 3464-70
United States Tax Court
T.C. Memo 1973-37; 1973 Tax Ct. Memo LEXIS 249; 32 T.C.M. (CCH) 169; T.C.M. (RIA) 73037; February 14, 1973, Filed Woodrow Wroblewski, pro se. Donald W. Williamson, Jr., for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION
HALL, Judge: Respondent contends the petitioner owes additional Federal income tax for the years and in the amounts as follows: [1] Year
Amount 1964
$76.00
1965
870.98
1966
1,075.57
1967
- 0 -
1968
577.79
Total
$2,600.34
*250 2 The amounts of tax alleged to be due from petitioner for 1964 and 1965 are due solely to the disallowance of a claimed net operating loss carryback from 1967. The issues for decision are the following: 1. During the years 1966 through 1968, was petitioner engaged in the business of farming for profit so as to entitle him to deduct losses from farming? 2. What was the amount of the casualty loss petitioner sustained in 1967 by reason of the total destruction of his family residence by fire? 3. Was petitioner entitled to a business expense deduction in 1966 for costs incurred in the construction of an office in his residence? 4. Did petitioner sustain a $400 capital loss in 1967 from the sale of stock? 5. Did petitioner realize a long-term capital gain or ordinary income from the sale in 1968 to a power company of a right-of-way across his property? GENERAL FACTS Some of the facts have been stipulated and are found accordingly. Petitioner was a resident of Sarasota, Florida, at the time he filed his petition herein. All Federal income tax returns for the years in issue were filed with the district director of internal revenue, Albany, New York. Petitioner *251 filed joint returns with his wife for 1964, 1965, 1966 and 1967, and a 3 separate return for 1968. Petitioner's wife separated from him in 1967 and 1968. Petitioner's wife did not join in the filing of the petition herein and is not a party to this proceeding. 1. Farm Loss Issue FINDINGS OF FACT Petitioner has been a consulting engineer since he left college in 1933. He worked in various engineering positions and for various firms both prior to and during the years in issue. Petitioner is also an inventor, writer and philosopher. Petitioner's father owned farms in both Poland and the United States, and petitioner has long had the goal of owning his own farm. In 1956 petitioner purchased a 167 acre farm in upper New York State for approximately $7,000, named it the Circle W Ranch, and petitioner and his mother moved to the farm from his former residence. One of the reasons prompting petitioner to buy the farm was the advice of doctors in the Delahey Clinic that he move from a manufacturing environment to a clean air environment in order to retard the growth of tumors in his nose. Petitioner believed he could make a living from the farm. At the time of purchase, *252 the farm was run-down and the soil was poor. On the farm there were only an old house and three barns. Petitioner purchased such a run-down farm because he could not afford a better one. Petitioner put every cent he had into the farm for 14 years in the hope and expectation 4 that he could make it into a profitable business. Petitioner's mother remained on the farm until her death. Petitioner's wife and her two children (by previous marriages) also moved into the residence a few years later when she and petitioner were married. They continued to live there until the residence was destroyed by fire in 1967. The farm was suitable primarily for grazing purposes. In the early years during which he owned the farm, petitioner maintained a herd of approximately 60 head of beef cattle. Around 1960, however, a New York State law was enacted, the purpose of which was to discover and eradicate the existence of Brucelosis in New York State cattle. Under the law, petitioner's cattle had to have a blood test to determine whether they had the disease. Petitioner did not have, and could not afford, facilities to hold immobilized cattle for testing. He could rope the steers with horses, *253 but the New York State veterinarians refused to test the cattle because petitioner lacked the appropriate equipment to constrain them. Due to the lack of these facilities, the cattle had to be sold about 1960. In 1956 petitioner began the cultivation of 40 acres of oats, wheat and corn, which he continued until about 1962. Petitioner also entered into a soil conservation contract with the Department of Agriculture for which he received soil bank payments. In addition, petitioner entered into another conservation program with the Department of Agriculture whereby the 5 government shared in the cost of treating the soil with lime. Petitioner originally bought two tractors to work the farm, but the smoke from the tractors irritated his nasal tumors, so he sold the tractors and bought nine draft horses to do the work. The draft horses were used in teams of three. In addition to raising cattle, petitioner raised draft horses. He also raised chickens, ducks, turkeys, pigs and various vegetables. He hired labor on a barter basis (in return for chickens, vegetables, etc.). Petitioner's family also worked on the farm. Petitioner and his 18 year old step-daughter plowed the fields *254 together, each using a team of three horses to pull his or her plow. In 1968 petitioner purchased 44 head of Charolais cattle in order to re-enter the beef cattle business. In preparation for this return, in 1966 petitioner fixed the fences and the barn, and installed a new automatic cattle feeder. In 1967 he built an implement barn, an automatic barn cleaner and two miles of new fence. In order to obtain building wood, petitioner cut logs in his own woods, drew the logs to the sawmill by a team of horses, and drew the cut boards back to the farm. He cut 10,000 to 20,000 board feet of timber in 1967. He also built a suitable pond for watering the cattle; because it was part of a government conservation project, he paid only 20% of the cost and the government paid the rest. Petitioner sold the Charolais cattle in 1969, and in 1970 he sold the farm for approximately $30,000. 6 During the period petitioner owned the farm he spent many long hours doing strenuous labor to keep the farm going. When he took outside jobs to earn additional funds to keep the farm operating, he would frequently commute all night Friday and Sunday so he could spend all weekend working on the *255 farm. Petitioner intended to make a profit from his farm. Petitioner did not recall whether he realized losses or profits from the farm prior to 1964 and he did not bother to keep records. However, notwithstanding petitioner's sustained efforts, the farm operation experienced losses during the years 1964 through 1968, as follows: Year
Loss 1964
$2,955
1965
2,525
1966
2,815
1967
1,948
1968
2,651
Petitioner pointed out that he did not record all his expenses on his returns, just big expenses for which he had kept receipts. For example, he did not record expenses for lime, fence posts and wire or horseshoes. Petitioner's gross farm income for the years 1964 through 1968 consisted of the following: Source
Sum Soil bank payments
$2,332
§ale of eggs
150
Sale of grain
150
Sale of work horses
(380)
Sale of saddle horses
(250)
Sale of saddles
(75)
Sale of right-of-way [2]
1,100
Total
$3,027
During the time petitioner owned the farm, he continued to work intermittently as a consulting engineer in order *256 to earn money to keep the farm operating. For example, 1966 he had to work for General Electric during the part of the year to earn money to make payments on a big tractor that the seller was threatening to repossess.The following schedule reflects the approximate non-farm income of petitioner and his wife, a telegraph operator, during the years 1964 through 1968: Years
Income 1964
$6,500
1965
11,000
1966
10,000
1967
14,000
1968 [3]
5,000
Petitioner's farming activities constituted the carrying on of trade or business for profit. OPINION Respondent contends that petitioner was not engaged in the trade or business of farming during 1966, 1967 and 1968, and therefore is not entitled to deduct farm losses. Petitioner 8 maintains he was in the business of farming to make a profit, and is entitled to deduct his losses therefrom.
Petitioner is entitled to deduct his ordinary and necessary expenses paid or incurred in farming and his losses arising from farming only if he is operating the farm for profit, and not for recreation or pleasure. Sections 162(a), and 165(a) and (c) (1), I.R.C. 1954; *257 [4]Sections 1.162-12 and 1.165-6(a), Income Tax Regs. The question of whether petitioner was farming for profit rather than for pleasure and recreation is a question of fact, and the burden rests with petitioner. Rule 32, Tax Court Rules of Practice. Petitioner is entitled to prevail if he can prove that he had a bona fide intention of making a profit from farming; it is not necessary that his expectation be reasonable as long as it is genuine. Margit Sigray Bessenyey, 45 T.C. 261 (1965), affd. 379 F. 2d 252 (C.A. 2, 1967), cert. denied 389 U.S. 931 (1967); Thomas W. Jackson, 59 T.C. No. 31 (1972). After an examination of all the facts and circumstances in this case, we are of the opinion that petitioner possessed the requisite genuine expectation of making a profit from farming, and therefore was in the business of farming during 1966, 1967 and 1968. 9 Petitioner had always wanted to be a farmer. Problems with his health finally caused him to put his desires into action in 1956. The fact that petitioner *258 experienced better health from living in the country does not negate his intention to operate the farm for profit. There is no evidence that petitioner ever used the farm for recreation or pleasure. Petitioner was not a wealthy man. He bought a small, poor, run-down farm for $7,000 because that was all he could afford. He put every cent he had into the purchase, operation and improvement of the farm. When he ran out of money, he accepted temporary jobs to earn enough to keep his family and his farm going. He and his family worked hard and long hours to try to make the farm a going business. The farm increased in value (no doubt at least in part as a result of his efforts) by about $23,000, considerably more than the aggregate net losses claimed, so that in fact there was a net ultimate profit from the venture. Petitioner might well have succeeded in making an operating profit had he not suffered two severe setbacks: (1) his house burned to the ground with all its contents in 1967, and (2) thereafter his wife left him and sued him for a divorce. In 1970 petitioner sold the farm for about $30,000. When he purchased the farm, petitioner intended to go into the business of *259 raising beef cattle. He bought one herd consisting of 60 head of cattle soon after he purchased the 10 farm, but had to sell the herd around 1960 when the State of New York enacted a law to detect and eradicate Brucelosis and petitioner did not have the facilities to have his cattle tested. Thereafter, petitioner worked to improve his facilities for raising and caring for cattle, and in 1968 he purchased a herd of 44 Charolais cattle. He kept these cattle until just before he sold his farm. Petitioner also grew oats, wheat, corn, and vegetables, and raised chickens, ducks, turkeys, pigs, and draft horses on his farm during the years in issue. Petitioner devoted all his time when not on a temporary job, and long weekends when on a temporary job, to arduous farm labor. He even cut his own timber to get boards for building additional farm buildings. He had the help of his family, and he hired neighbors who would accept farm products in payment for their labors. It is not necessary that petitioner devote his full time to farming in order to be in business for profit. Mercer v. Commissioner, 376 F. 2d 708, 710 (C.A. 9, 1967), reversing a Memorandum Opinion of *260 this Court. Although petitioner apparently suffered continuous losses from his farm prior to his ultimate profit in 1970, that fact is not controlling where as here the other evidence shows that petitioner had a bona fide intention of eventually making a profit. Norton L. Smith, 9 T.C. 1150, 1155 (1947). After careful examination of the entire record, we conclude that petitioner was engaged in the business of farming with the 11 intention of making a profit. 2. Casualty Loss Issue FINDINGS OF FACT When petitioner purchased the farm it had on it an old house without bathrooms. Petitioner completely rebuilt the house. A contractor did $5,000 worth of heavy construction work on the house. Petitioner did much of the rest of the work. In 1966 he invested $1,600 in converting a portion of the residence into an office. In 1967 petitioner's residence was completely destroyed by fire. Petitioner and his family were able to save only the clothes they had on. Petitioner claimed a $23,272 casualty loss, computed as follows: House
15,000
Contents
18,272
Total
$33,272
Less insurance recovery
(10,000)
Casualty loss
$23,272
The revenue *261 agent, in his supplemental report, allowed a casualty loss of only $11,150, computed as follows: House
$14,767
Contents
6,383
Total
$21,150
Less insurance recovery
(10,000)
$11,150
Petitioner estimated the fair market value of each item on a detailed four page schedule of destroyed items attached to his 1967 return. He testified that the cost of these items was about double their estimated fair market value. 12 The revenue agent asked the Salvation Army outlet store in Albany, New York, to estimate the value of the items on the schedule attached to the return. He used the resulting figures in preparing his report. The amount of the casualty loss in 1967 was $23,272. OPINION In 1967 petitioner's residence, including all its contents, was completely destroyed by fire. The parties agree that petitioner has suffered a deductible casualty loss. The only issue is the amount of the loss. Petitioner is entitled to deduct the difference between the fair market value of the property immediately before and after the fire, but not in excess of the adjusted basis of the property, less the amount of any insurance recovery, to the extent that amount *262 exceeds $100. Sections 165(a) and (c) (3); Section 1.165-7(b), Income Tax Regs.
The value of the residence after the fire was zero. The parties agree that the insurance recovery was $10,000. Petitioner claims the loss on the residence is $15,000 and respondent asserts it is $14,767. The principal area of difference between the parties lies in determining the value of the contents of the house. Petitioner appended to his 1967 return a four page schedule listing the items destroyed and their fair market value. He testified that he had estimated their value, and that the cost of these items was about double their value. 13 Respondent took petitioner's list to a Salvation Army outlet store in Albany and obtained the advice of its employees concerning the value of the listed items. Although we acknowledge that petitioner is not an expert appraiser, his testimony is admissible on this point ( W. F. Harmon, 13 T.C. 373, 383 (1949)), and is essentially honest and truthful. He was familiar with the lost items and better able to appraise them than the Salvation Army employees. We accept his testimony as to their value and cost. Petitioner is entitled to a casualty *263 loss deduction of $23,172 ($23,272 loss less $100). 3. Office Construction Issue FINDINGS OF FACT In his 1966 return petitioner deducted $1,600 as office construction expense. The amount represented the cost of converting a portion of petitioner's residence into an office. The revenue agent, in his supplemental report, treated the expenditure as a capital expenditure, and allowed a depreciation deduction of $83 for the office. Petitioner presented no evidence on this issue at the trial. OPINION Respondent contends that petitioner is not entitled to deduct on his 1966 return the $1,600 he paid for construction of an office in his residence, but instead must depreciate it over its useful life. 14 Petitioner, who has the burden of proof, offered no evidence on this point. Consequently, respondent's determination is sustained. 4. Stock Loss Issue FINDINGS OF FACT On his 1967 return petitioner deducted $400 as a "Loss on Bankrupt Webcor, Inc." Respondent disallowed the deduction for lack of substantiation. During the trial petitioner testified that Webcor did not go bankrupt in the technical sense, but its stock went from around $10 a share to about *264 30" a share. He further testified that he had purchased some Webcor stock for $450 and sold it later through Bache & Co. for $50, realizing a $400 loss in 1967. OPINION Petitioner claims he is entitled to deduct a $400 capital loss in 1967 arising from the sale at a loss of his Webcor, Inc. stock. Respondent disallowed the loss on the ground that petitioner had failed to substantiate it. Petitioner met his burden of proof by presenting his own direct and uncontroverted testimony on this issue, which we accept. We hold that petitioner has substantiated his 1967 capital loss in the amount of $400. 5. Right-of-Way Issue FINDINGS OF FACT Petitioner sold a right-of-way for a gas line across his farm to Niagara Mohawk Power Company for $1,100. The gas line 15 was put through a field, which made the field completely unusable for farming. Petitioner reported the $1,100 as farm receipts (ordinary income) on his 1968 return. Respondent determined that the sale resulted in a long-term capital gain of $1,080 ($1,100 payment less $20 basis). OPINION Petitioner claimed the sale proceeds were farm income because after the gas line was laid, the field through which it *265 ran was not useful for farming. Respondent claims petitioner realized a long-term capital gain in 1968 on the sale to Niagara Mohawk Power Company of a right-of-way across his property, and we agree. Although it is difficult to understand the nature of the dispute, since each side argues that which is financially to the advantage of the other, we hold that the sale of the right-of-way is the sale of a capital asset, and the sale proceeds constitute capital gains. Decision will be entered under Rule 50. Footnotes
1. The statutory notice issued to petitioner on March 9, 1970, asserted deficiencies in the total amount of $5,137.32. Subsequently, the revenue agent prepared another and supplemental report dated June 5, 1970, wherein he recommended adjustments which reduced the asserted deficiencies from $5,137.32 to the amount of $2,600.34 as set out above. Counsel for respondent has conceded the incorrectness of the statutory notice as to the balance of the $5,137.32. ↩
2. Respondent contends the sale of right-of-way across the farm resulted in a capital gain and not farm income. ↩
3. Petitioner filed a separate return for 1968. ↩
4. All Code references are to the Internal Revenue Code of 1954, as amended, in effect during the years in issue. ↩